

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-75,812

**HENRY WATKINS SKINNER, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON APPEAL FROM THE DENIAL OF A MOTION FOR POST-CONVICTION DNA TESTING FROM CAUSE NO. 5216 IN THE 31ST DISTRICT COURT GRAY COUNTY

KELLER, P.J., delivered the opinion of the Court in which MEYERS, PRICE, JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. WOMACK, J., concurred.

At appellant's trial, some evidence was tested for DNA, and some was not. State and federal district courts have both found that defense counsel had a reasonable trial strategy for not requesting the testing of the untested items. Some of the remaining items were subsequently tested. Appellant now requests testing of items that still remain untested. We hold that, in the usual case, the interests of justice do not require testing when defense counsel has already declined to request testing as a

matter of reasonable trial strategy. Under that holding, we affirm the trial court's decision to deny the motion for DNA testing.

## I. BACKGROUND

Appellant lived with Twila Busby and her two adult sons, Randy Busby and Elwin Caler, both of whom had mental retardation. Between 10:15 and 10:30 p.m., on December 31, 1993, Howard Mitchell came to the residence to take appellant and Twila to a New Year's Eve party. Howard found appellant asleep on the couch and was unable to wake him. Appellant had apparently been drinking. Leaving appellant on the couch, Twila and Howard went to the party, but Twila soon asked to be taken home because her uncle, Robert Donnell, was drunk and was following her around, making rude sexual advances, and generally agitating her. Howard drove Twila home between 11:00 and 11:15 p.m., and left.

At around midnight, Elwin showed up on a neighbor's porch with stab wounds, from which he subsequently died. Twila was found dead on the living room floor of her home, and Randy's dead body was found lying face down on the top bunk bed in the sons' bedroom. Appellant was found by police at Andrea Reed's house, located three-and-a-half to four blocks away, at around 3:00 a.m. When the police found him, appellant was standing in a closet and wearing clothing that was heavily stained in blood on both the front and back.

At trial, Andrea testified that appellant arrived at her house at around midnight and that they conversed for three hours. She did not know how he entered her trailer, but when she saw him, he took his shirt off and laid it on a chair. Appellant had a bleeding cut in his right hand. He heated up sewing needles and attempted to bend them to sew up his hand, and then he asked her to sew it, and she agreed. At some point, he went to the bathroom by himself. During their conversation,

Andrea attempted to leave the room and call the police, but appellant stopped her and threatened to kill her. Appellant told Andrea multiple stories about what happened at his home. He claimed that a Mexican came to the door and pulled a knife, that Twila was in bed with her ex-husband with whom appellant got into a fist-fight, that appellant thought he had killed Twila by trying to kick her to death, that Ricky Palmer broke into the house, and that cocaine dealers were looking for Twila and wanted her really bad.

The medical examiner found that Twila had been strangled into unconsciousness and subsequently beaten at least fourteen times about the face and head with a club. DNA testing matched the blood on appellant's clothing to Twila and Elwin. Three bloody handprints matching appellant's were found in the house: one in the sons' bedroom and two on doorknobs leading out the back door.

A toxicological test of appellant's blood, conducted at 5:48 a.m., showed that appellant had 0.11 milligrams of codeine per liter of blood and a blood alcohol level of 0.11.

Defense counsel presented three defenses at trial. First, defense counsel focused on the State's failure to test some of the DNA evidence to show that the State engaged in a sloppy investigation. Second, defense counsel painted Robert Donnell as an alternate suspect who could have committed the murders.

Finally, defense counsel presented evidence that appellant was too incapacitated by his intoxication to have committed the murders. Dr. William Lowry, the defense toxicologist, testified that most people at appellant's level of intoxication would be comatose or asleep, and in any event, between 12:00 and 3:30 a.m., appellant would have been in a stupor, with impaired consciousness, general apathy, and an inability to stand or walk. Dr. Lowry believed that appellant was too

incapacitated to travel to different rooms to kill the victims. However, Dr. Lowry was surprised that appellant could locate Andrea's house at midnight and that he asked her to sew up his hand.

Appellant was convicted of capital murder and sentenced to death.[1] This Court affirmed his conviction and sentence on direct appeal.[2]

In July of 2000, the Gray County District Attorney's Office requested that certain additional items be subjected to DNA testing by GeneScreen. Many items were subjected to traditional genomic DNA testing and/or the newer mitochondrial DNA testing. The genomic DNA testing revealed the following: Twila was included as a contributor to blood on the cover of a blue notebook, a hair found on her back, a hair found in her left hand, and a hair from an axe handle. Appellant was included as a contributor to DNA found on a cigarette butt. Twila and appellant were both included as contributors to a mixed profile from hair in Twila's right hand. Bloodstained gauze reflected the profile of an unknown male individual, and a cassette tape with blood on it reflected a profile that was a mixture of two unknown individuals. No conclusion could be drawn about certain other items.

Mitochondrial DNA testing revealed the following: The mitochondrial profile of Twila, or any maternal relative of hers, was included in one of two hairs found in her right hand (the "first" hair) as well as some other hairs collected from the scene. Appellant was excluded as a contributor to these hairs. Results from the other hair found in Twila's right hand (the "second" hair) and a hair found in the living room were inconclusive.

---

[1]Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ §19.03(a); Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. art. 37.071. All references to articles are to the Texas Code of Criminal Procedure.

[2] *Skinner v. State*, 956 S.W.2d 532 (Tex. Crim. App. 1997).

Several items remained untested, either because the District Attorney's office did not submit them or because the items were submitted but GeneScreen did not test them. Appellant filed a motion for DNA testing under Chapter 64.[3] He wanted to obtain testing on two knives found at the scene, a rape kit from Twila, a blood-like substance on a cup towel found at the scene, blood from under Twila's fingernails, and hair and blood from a jacket found in the house. The trial court denied the motion, and we affirmed the trial court's decision on appeal.[4] In our fact recitation, we pointed to the "bloody palm prints" matching appellant and to the fact that appellant's clothing "was covered in the blood of two of the victims."[5] In the analysis section of our opinion, we explained that the mixture of appellant's and Twila's DNA in blood found on the hairs in Twila's right hand "demonstrates the intermingling of the victim's and appellant's DNA, probably during the time when she was struggling for her life."[6] From this evidence, we concluded that "there is nothing about the other items found at the crime scene that, if linked to a third person, would cast doubt on the appellant's presence at the scene of [Twila's] death or the appellant's involvement in the offense. Given this evidence and the other evidence detailed above, the presence of a third party's DNA at the crime scene would not constitute affirmative evidence of innocence."[7] And, disagreeing with appellant's contention that GeneScreen's reports were ambiguous, we upheld the trial court's decision to deny the production of benchnotes that were created by the company during the course

---

[3] *See* art. 64.01, *et seq.*

[4] *Skinner v. State*, 122 S.W.3d 808 (Tex. Crim. App. 2003).

[5] *Id.* at 810.

[6] *Id.* at 811.

[7] *Id.*

of testing.[8]

Appellant subsequently filed a habeas corpus petition in federal court. The federal district court found against him on all claims, and he filed an appeal with the Fifth Circuit. While that appeal was pending, he filed a second motion for DNA testing in state district court. In this second motion, he requested testing for the same items requested in the first motion, but he claimed that testing was now required due to a new legal development in this Court and new factual developments in connection with the federal habeas proceedings. The trial court denied testing for a number of different reasons, and appellant appealed. It is that appeal that is now before us.

## II. ANALYSIS

The trial court agreed with appellant that the evidence he seeks to test still exists and is in a condition making DNA testing possible, that the chain of custody is sufficient and the integrity of the evidence has been maintained, that identity was an issue in appellant's case, and that the second motion for DNA testing is not made to unreasonably delay the execution of sentence or the administration of justice.[9] Nevertheless, the trial court denied appellant's second motion for DNA testing for a number of reasons: (1) law of the case, as the issues decided in appellant's first application were virtually identical, (2) failure to show ineffective assistance of counsel with respect to the first DNA motion, a showing the trial court believed was the only exception permitting a subsequent DNA motion, (3) failure to meet the "no-fault-of-the-convicted-person" requirement of article 64.01(b)(1)(B) because trial counsel declined to seek DNA testing as "a matter of sound trial strategy," (4) failure to meet the "no-fault-of-the-convicted-person" requirement of article

---

[8] *Id.* at 812.

[9] Order on Defendant's Second Motion for DNA Testing, findings 1-4.

64.01(b)(1)(B) because appellant failed to meet his burden of proof on the first DNA motion and has not alleged that counsel on that motion was ineffective, and (5) failure to accompany appellant's second DNA motion with an affidavit or the unsworn declaration of an inmate.[10] These reasons present a number of interesting legal issues, but we choose to address only the third, and we conclude that the trial court's resolution on that rationale was correct.[11]

Chapter 64 contains several requirements that must be met before a convicted person may obtain DNA testing. One of these requirements is an "unavailability" showing, which can be satisfied when the record shows one of several scenarios:

[The evidence in question . . .]

(1) was not previously subjected to DNA testing:

(A) because DNA testing was:

(i) not available; or

(ii) available, but not technologically capable of providing probative results; or

(B) through no fault of the convicted person, for reasons that are of a nature such that the interests of justice require DNA testing; or

(2) although previously subjected to DNA testing, can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results

---

[10] *Id.*, findings 5-9.

[11] With respect to (5), we observe that Chapter 64 requires that a DNA motion "be accompanied by an affidavit, sworn to by the convicted person, containing statements of fact in support of the motion." Art. 64.01(a). Appellant claims the affidavit from his first motion was incorporated by reference into his second motion and that such incorporation was sufficient to satisfy the statutory requirement. We do not address this issue.

that are more accurate and probative than the results of the previous test.[12] Another requirement is the "different outcome" showing, which is satisfied when "the convicted person establishes by a preponderance of the evidence that . . . the person would not have been convicted if exculpatory results had been obtained through DNA testing."[13]

With respect to the unavailability showing, appellant asserts only the "no fault . . . interests of justice" scenario found in article 64.01(b)(1)(B). He claims that this unavailability scenario would be satisfied if trial counsel were found to be constitutionally ineffective in failing to seek testing of the items in question. He also claims, based on the unpublished opinion in *Raby v. State*,[14] that the interests of justice require testing if such testing could establish guilt or innocence, especially where there exists substantial lingering doubt about whether the convicted person committed the crime. His argument appears to equate the "no fault . . . interests of justice" scenario for showing unavailability with the separate "different outcome" requirement. Our reading of appellant's position in this regard is further supported by his much more extensive reliance upon *Raby* in connection with his argument regarding the "different outcome" showing and by his contention that "additional evidence has come to light that further, and dramatically, casts doubt on Mr. Skinner's guilt," creating circumstances under which "the interests of justice, *which the legislature sought to protect via Article 64.03(a)(2)(A)*, require the testing of the DNA evidence identified in [appellant's] First

---

[12]  Art. 64.01(b).

[13]  Art. 64.03(a)(2)(A).

[14]  No. AP-74,930 (Tex. Crim. App. June 29, 2005)(plurality op.)(not designated for publication).

Motion."[15]

Under this Court's approach to statutory construction, we interpret a statute in accordance with the plain meaning of its language unless the language is ambiguous or the plain meaning would lead to absurd results that the legislature could not have possibly intended.[16] In determining the plain meaning of the statutory language we read words and phrases in context and construe the text according to the rules of grammar and usage, and we presume that "the entire statute is intended to be effective."[17]

The "no fault . . . interests of justice" provision does not exist in a vacuum. That provision is phrased in the alternative with other provisions that unambiguously address whether DNA testing was available in some fashion to the defendant at trial. DNA testing was not conducted either because it was unavailable, or because the particular technology available at the time would not yield probative results, or testing was conducted but newer technology would yield more accurate and probative results. In context, the "no fault . . . interests of justice" provision shares the character of these other, alternative provisions as a method of ascertaining the availability of DNA testing. So it is not enough under this provision to claim, as appellant does, that an exculpatory test result would change the outcome of the case. The fact that testing would be outcome-determinative, if conducted, does not mean that the testing was in some sense unavailable.

Moreover, appellant's position would render the article 64.01 availability provisions

---

[15] Emphasis added.

[16] *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[17] *Dowthitt v. State*, 931 S.W.2d 244, 258 (Tex. Crim. App. 1996); *see also* TEX. GOV'T CODE §§ 311.011(a), 311.021(2).

meaningless. The "no fault . . . interests of justice" provision found in article 64.01(b)(1)(B) would be redundant because a convicted person is already required to prove the outcome-determinative nature of testing under article 64.03(a)(2)(A). And by swallowing the "no fault . . . interests of justice" provision, an outcome-determinative test would render meaningless the other alternatively phrased availability provisions. There would never be any need to determine whether DNA testing was available, whether it could produce probative results, or whether newer techniques would produce more accurate results. The inquiry under article 64.01(b)'s availability provisions would always revolve around the "no fault . . . interests of justice" question because the answer would also resolve the outcome-determinative requirement found elsewhere in the statute. Such an interpretation is simply untenable.

Nor are we persuaded by appellant's reliance upon our unpublished, plurality opinion in *Raby*. Under Rule 77.3 of the Rules of Appellate Procedure, unpublished opinions from this Court "have no precedential value and must not be cited as authority by counsel or by a court."[18] Appellant claims that he cites *Raby* only as persuasive authority, but the rule prohibits the use of an unpublished opinion as authority of any sort, whether binding or persuasive.[19] Appellant contends that Rule 77.3 is functionally identical to Rule 47.7, which applies to the courts of appeals and provides that unpublished opinions "have no precedential value but may be cited with the notation, "(not designated for publication)."[20] We disagree. Rule 47.7 used to contain the same language

---

[18] T EX. R. APP. P. 77.3.

[19] The rule does not prohibit citation to an unpublished opinion for the purpose of showing facts or the procedural history of the case.

[20] *See id.*, R. 47.7.

found in Rule 77.3,[21] but the language was changed to accomodate changes in civil practice.[22] And appellant's contention that *Raby* encapsulates the Court's thinking is undercut by its plurality status. And even if an unpublished, plurality opinion could be considered, its persuasive value would be minimal and would not override a statutory construction analysis based on the plain meaning of the statutory text.[23]

We do agree with appellant that evidence that counsel provided constitutionally ineffective assistance in failing to seek DNA testing of certain items could be sufficient to show that the failure to test was not appellant's fault "for reasons that are of a nature such that the interests of justice require DNA testing." The reasoning behind permitting challenges to the effectiveness of a trial attorney's representation is that "[a]n accused is entitled to be assisted by an attorney . . . who plays the role necessary to ensure that the trial is fair."[24] Conversely, if trial counsel declined to seek testing as a matter of reasonable trial strategy, then post-trial testing would not usually be required by the interests of justice. To hold otherwise would allow defendants to "lie behind the log" by failing to seek testing because of a reasonable fear that the results would be incriminating at trial but then seeking testing after conviction when there is no longer anything to lose.

But no showing of ineffective assistance has been made here. Appellant acknowledges that

---

[21] *See* TEX. R. APP. P. 47.7 (West 2002).

[22] *See* TEX. R. APP. P. 47, Notes and Comments, 2nd para. (West 2008).

[23] At any rate, we do not believe that the reasoning in the plurality opinion in *Raby* is inconsistent with our holding today, and the facts in *Raby* are highly distinguishable because no blood or physical evidence in that case connected the convicted person to the scene of the crime. *See Raby*, No. AP-74,930, HTML op. at 7.

[24] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

the federal district court decided this question adversely to his position.[25]  Trial counsel explained

that he did not ask for testing because he was afraid the DNA would turn out to be appellant's.[26]  The

federal district court found that an incriminating DNA test result of biological material from some

of the items, such as from the knife handle, or under Twila's fingernails, or found clutched in her

hand, would have been highly probative, incriminating evidence for the prosecution.[27]  The court also

concluded that conducting its own DNA test would also have deprived the defense of its primary

argument at trial that the government conducted a shoddy investigation.[28]  The court also found that

defense counsel reasonably feared that any testing he performed could not be kept secret because the

State would know what items he tested and could decide to test them as well.[29]   And the court

observed that defense counsel was relieved when the deadline had passed and the State had done no

further testing.[30]  Appellant makes no independent argument in this Court to demonstrate that

counsel was ineffective.  Rather, he relies in his brief solely upon the possibility that the Fifth Circuit

 might reverse the federal district court's decision.  Sometime after appellant's brief was submitted,

the Fifth Circuit issued an opinion denying a certificate of appeal on that question.[31]  As we have

explained above, the state district court found that the failure to seek DNA testing was "a matter of

---

[25]  *See Skinner v. Quarterman*, 2007 WL 582808 at 29-33 (February 22, 2007).

[26]  *Id.* at 29.

[27]  *Id.* at 31.

[28]  *Id.* at 32.

[29]  *Id.* at 31.

[30]  *Id.*

[31]  *Skinner v. Quarterman*, 528 F.3d 336, 341-42 (5th Cir. 2008).

sound trial strategy." This conclusion is supported by the record.

We next turn to appellant's contention that evidence in addition to that presented at trial supports the conclusion that DNA testing would be in the interests of justice. The evidence falls into two categories: (1) evidence that buttresses a claim that appellant was too incapacitated by intoxication to have committed the murders, and (2) the results of DNA testing conducted in 2000. Appellant points to three types of evidence relating to his alleged incapacitation: (1) recantations by Andrea Reed, (2) evidence that appellant had previously reported an allergy to codeine, and (3) blood spatter evidence suggesting that Elwin was in the room when Twila was being beaten.

At the federal habeas hearing, Andrea testified that she lied when she indicated that appellant entered her house on his own, removed his shirt, heated needles, and used the bathroom.[32] She claimed that she actually had to assist him in entering the house and using the bathroom and that she heated the needles and removed his shirt because appellant was unable to perfom even simple tasks on his own.[33] She also claimed that she lied when she said that he threatened her and that he merely asked her not to tell anyone. Finally, she claimed she gave false statements during the police investigation and at trial because the police had threatened to arrest her for harboring appellant when she knew that he had warrants against him.[34]

Defense counsel could not have anticipated that Andrea would recant her trial testimony. Assuming, without deciding, that in an appropriate case, new, unforeseeable evidence could cast a new light on what was at the time a reasonable trial strategy so as to require DNA testing in the

---

[32] *Skinner,* 2007 WL 582808 at 8

[33] *Id.*

[34] *Id.* at 9.

interests of justice, Andrea's testimony does not do so here. Appellant concedes that the federal district court did not credit her recantation testimony. The federal district court found Andrea's recantation testimony to be not credible or truthful.[35]

In arriving at this conclusion, the district court cited a great deal of rebuttal evidence that contradicted the recantations. Gerry Douglas, a neighbor, testified that Andrea told him appellant had come barging into her house, had run into the back bedroom, and had threatened to kill her and her kids if she told anyone where he was hiding.[36] Appellant's ex-wife Connie Neighbors testified that Andrea told her that appellant had been to her house, had told her that he thought he had killed the victims, and had threatened her if she called anyone.[37] Both of these statements were made shortly after the incident and the witnesses respectively characterized Andrea as "hysterical" and "shaking and crying."[38] In a police statement, Jessica Reed, Andrea's daughter, recalled that applicant banged loudly on the door, identified himself, and entered the house before Andrea reached the living room.[39] At some point Jessica heard applicant ask where the bathroom was and then say that he knew where it was. She also heard Andrea tell him to go back to the living room after he left the bathroom.[40] Jessica no longer remembered the events in question, but she maintained that what

---

[35] *Skinner,* 2007 WL 582808 at 16.

[36] *Id.* at 9.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

she said in her statement was what happened.[41] Testimony from law enforcement witnesses contradicted Andrea's claim that the police threatened her.[42]

The state district court adopted the federal district court's rejection of Andrea's recantation.[43] We review deferentially the state district court's determination of the credibility of a recantation,[44] and the state district court's finding in this case is supported by the record.

With respect to the codeine and blood spatter evidence, appellant's claim in the federal habeas proceedings was that counsel was ineffective. Assuming, without deciding, that ineffective assistance with respect to non-DNA evidence could, in an appropriate case, impact the reasonableness of a trial strategy to forgo DNA testing, we nevertheless reject appellant's contentions. In the federal habeas proceedings, appellant presented evidence that he had informed defense counsel in a letter that he was allergic to codeine and that he had self-reported a codeine allergy in various hospital visits.[45] Counsel did not recall seeing the information, and he did not discuss it with Dr. Lowry.[46] Dr. Lowry testified that this information would have bolstered his trial testimony regarding appellant's incapacity argument because a codeine allergy would have enhanced appellant's disability after taking codeine that night, or if appellant incorrectly believed that he was

---

[41] *Id.*

[42] *Id.* at 9-10.

[43] *See* Order, finding 15.

[44] *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002).

[45] *Skinner,* 2007 WL 582808 at 23.

[46] *Id.* at 24.

allergic to codeine, he would have avoided it and thus not developed a tolerance to the drug.[47]

The federal district court assumed, for the purposes of argument, that trial counsel performed deficiently in failing to inform Dr. Lowry that appellant might be allergic to codeine, but the court held that appellant was not prejudiced.[48] We find the following facts cited by the federal district court to be significant with respect to that conclusion and with respect to the case at hand: Appellant did not appear to have an allergic reaction to the codeine in his system on the night of the offense.[49] Appellant's ex-wife testified that appellant was not allergic to codeine, but he did not like to use it because it was not strong enough.[50] Dr. Michael Chamales, an emergency room medical director who was an emergency room doctor who treated appellant in October 1993, testified that appellant self-reported having a codeine allergy, but appellant was also caught trying to steal syringes.[51] Dr. Chamales further testified that, in his experience, drug seekers will report false allergies so that doctors will be directed to prescribe more desirable medications.[52] Appellant also reported an allergy for Toradol but had a prescription for it filled in June of 1993.[53] Appellant did supply the testimony of Lori Brim, a friend of his, who suggested that she saw appellant have an allergic reaction to codeine many years ago, but this was based on a suggestion made over the telephone by a nurse, not

---

[47] *Id.* at 23.

[48] *Id.* at 24.

[49] *Id.*

[50] *Id.*

[51] *Id.* at 23.

[52] *Id.*

[53] *Id.* at 24.

the diagnosis of a medical professional.[54]

Appellant also claims that blood spatter evidence shows that Elwin must have been in the room when Twila was killed and that appellant, in his intoxicated state, was not likely to have overcome both victims at the same time, especially since Elwin was six feet six inches tall and weighed 225 pounds. In the federal habeas proceedings, appellant claimed that trial counsel was ineffective for failing to use this evidence at trial and show it to his expert, Dr. Lowry.[55] Dr. Lowry testified that this evidence would have bolstered his testimony because he would have testified that appellant did not have the capacity to kill Twila while fending off her son.[56] The federal district court assumed that counsel's performance was deficient but found no prejudice.[57] The Fifth Circuit said that a finding of prejudice on this issue would require "considerable speculation," but it held that the issue was arguable and granted a certificate of appeal.[58] In a later appeal, the Fifth Circuit rejected appellant's contention and affirmed the district court.[59]

We find persuasive several facts cited by the federal district court on this matter. The medical examiner had testified that Twila would have been unconscious from strangulation before she was beaten, so she could have been unconscious or dead before Elwin entered the room.[60] And

---

[54] *Id.*

[55] *Id.* at 21.

[56] *Id.*

[57] *Id.* at 22.

[58] *Skinner*, 528 F.3d at 344.

[59] *Skinner v. Quarterman*, 2009 U.S. App. LEXIS 15570 at 4-10 (5th Cir., July 14).

[60] *Skinner,* 2007 WL 582808 at 22.

Elwin suffered from disabilities: He was "slow" and had muscular dystrophy and diabetes, and these disabilities prevented him from working.[61] Given these conditions, he might not have been able to mount an effective defense.[62]

Moreover, a number of other facts indicate that appellant did possess the capacity to commit the murders. Appellant walked three-and-a-half to four blocks from his home to Andrea's house.[63] This was inconsistent with what Dr. Lowry thought a person with the amount of codeine and alcohol in appellant's system could do.[64] Further, Dr. Lowry acknowledged that it was possible that appellant took the codeine *after* the murders, possibly to soothe the pain in his injured hand.[65] In addition, appellant told authorities that they would be amazed what he did "mind-wise" when he was drunk, as he can read and do math, and he even defended himself successfully in traffic court once, although he does not remember things afterwards.[66] And appellant's long history of alcohol and drug abuse does suggest that he would be more drug tolerant than the average individual.[67]

In addition, other evidence circumstantially linking appellant to the crime suggests that he must have had the capacity to commit it. A substantial amount of incriminating physical evidence

---

[61] *Id.*; *see also Skinner*, 956 S.W.2d at 535, 535 n.2 (Elwin and Randy were referred to as "mentally-retarded" at trial, but their levels of functioning were not elaborated upon).

[62] *See Skinner,* 2007 WL 582808 at 22 ("Thus, even given his size . . . Elwin's ability to fight back or escape might have been lower than persons his size without disabilities").

[63] *Id.* at 15; *see also Skinner*, 528 F.3d at 343, 343 n.8, 344 n.10.

[64] *See Skinner,* 2007 WL 582808 at 25; *Skinner*, 528 F.3d at 344 n.10.

[65] *Skinner,* 2007 WL 582808 at 23, 25; *Skinner*, 528 F.3d at 343.

[66] *Skinner,* 2007 WL 582808 at 17.

[67] *See Skinner*, 528 F.3d at 340.

connected appellant to the crime: DNA testing of blood stains on his clothing showing a match with Twila and Elwin, the serious cut in appellant's right hand, the matching handprints found in the house, and the mixed profile containing appellant's and Twila's DNA. Appellant linked himself to the crime in a statement to the police in which he said that he thought Twila gave him the cut on the hand that night and they may have gotten into a fight, but he claimed not to remember plainly.[68] And because the district court found Andrea's recantation to be not credible, we also take into account her original story that appellant came into her house on his own power and used threats to prevent her from calling the police or anyone else. Moreover, other incriminating information related by Andrea was not recanted: the multiple stories about what happened that night and appellant's instructions to Andrea to stitch up his hand and not to call anyone.[69] Given these circumstances and all of the other evidence discussed, we conclude that appellant's proferred evidence on the issue of incapacity does not call into question defense counsel's strategy to forgo DNA testing.

Finally, we address appellant's reliance on the DNA testing conducted in 2000. Assuming, without deciding, that in an appropriate case post-trial DNA testing could cast a new light on what was at the time a reasonable trial strategy not to seek testing, so as to require further DNA testing in the interests of justice, we decide that such is not the case here. Appellant contends that mitochondrial testing of the first hair in the victim's right hand revealed that it came from one of the victims or a maternal relative of the victims, which would include the defense's alternate suspect, Robert Donnell. Appellant claims that mitochondrial testing of the second hair shows that it did not come from the victims or appellant. He contends that these results "raise the very real possibility

---

[68] *See Skinner*, 528 F.3d at 340, 340 n.1.

[69] *See Skinner,* 2007 WL 582808 at 11-12, 17.

that Donnell or another outsider to the household was the real murderer." He suggests that raising such a "very real possibility" is sufficient grounds for obtaining DNA testing. We are not persuaded.

By itself, a mitochondrial test result linking the first hair to one of the victims or a maternal relative of the victims means nothing. Portions of the federal habeas hearing are included in the record before us. Dr. William Shields, the defense DNA expert at the federal habeas hearing, explained that, usually, all maternal relatives have the same mitochondrial DNA signature. So any hair from Twila would also match her two sons, her mother, and any uncles and aunts that are children of her maternal grandmother. Dr. Shields acknowledged that, under most circumstances, mitochondrial DNA testing was not a useful method of distinguishing between maternal relatives. He testified that paternal leakage can occur, but it does so in less than one in a million instances. So, if Robert Donnell is a maternal relative of the victims, as appellant suggests, then a mitochondrial testing result that matches the victims' maternal line does not, by itself, convey any meaningful information about his potential involvement in the offense. And appellant does not proffer any other information to suggest that the first hair came from someone other than the victims.

Appellant's claim that the second hair did not come from him or the victims is based upon testimony from Dr. Shields at the federal habeas hearing. Though the GeneScreen report says that the test result was "inconclusive," Dr. Shields disagreed, based upon underlying data obtained during federal discovery proceedings. Dr. Shields concluded that Twila (and presumably her sons) were absolutely excluded as contributors of the mitochondrial DNA due to differences on many of the reference points. Based upon one absolute difference and two other differences "on the face, " he concluded that appellant was more likely than not excluded as a contributor. He acknowledged that a difference in one base pair might not be enough to exclude a person. Dr. Shields further testified

that "based on today's standards it would be rational, though I think wrong, based on what I saw, to say that you couldn't make a decision to exclude or include" appellant. "In other words, I would not exclude him from attributing that hair myself, not in that sort of sense, but I believe it's more likely to exclude than include." In an affidavit submitted before his testimony, Dr. Shields related that he had been provided a report of a December 2000 telephone conversation between GeneScreen and the District Attorney, which included a statement that the second hair likely came from appellant, but the written report changed this conclusion to "inconclusive." Dr Shields found both of these conclusions to be inexplicable.

Dr. Shields acknowledged that he was working from incomplete data. He testified that a review of the electronic data was necessary to confirm the hard copy data, but, though he possessed a compact disc purporting to contain electronic data, the data was not in usable form. He also testified that the hard copy data was incomplete.

William Watson, a senior forensic scientist at GeneScreen, testified that he gave an "inconclusive" result because he determined that he was dealing with a mixed sample, and it would not have been appropriate to interpret a mixed sample.[70] According to a mitochondrial testing protocol that Dr. Shields acknowledged was used in the industry, "interpretations regarding the sources of mixtures should be made very cautiously, if at all." Dr. Shields nevertheless maintained, "I've reviewed many protocols. And all of them allow for interpretation of mixed samples, especially exclusions." But Dr. Shields also admitted that DNA samples could be contaminated much more easily for mitochondrial DNA testing purposes than for genomic DNA testing purposes.

Dr. Shields also maintained that the sample was not a mixture but was not asked to

---

[70] *See* Order, finding 13; *Skinner,* 2007 WL 582808 at 30.

specifically elaborate on that conclusion. He later read the following passage from the submitted protocol: "The possibility of a mixture should be considered when more than one peak occurs in a particular based position, that is not presumed to be due to background noise, messy data, irregular spacing, heteroplasmy, et cetera. A mixture of mtDNA from two people will show two different peaks in all the base positions where one person's sequence differs from the other." Then, after reading the sentence urging caution in evaluating mixed samples, Dr. Shields concluded, "So all I'm saying about this particular thing is that it, like most other interpretation guidelines, recognizes that there are things that may look a little bit like mixtures, but they are (inaudible) interpretation."

Appellant's evidence regarding the second hair is simply too tenuous and speculative to warrant consideration. Even if we accept Dr. Shields's opinion that the victims were excluded as contributors, that would also mean that Robert Donnell was excluded, if, as appellant claims, he was a maternal relative. Dr. Shields's conclusion that appellant was excluded was far more shaky. In saying that appellant was more likely than not excluded, Dr. Shields was in essence acknowledging up to a 49 percent chance that appellant was in fact the contributor. Dr. Shields expressed understanding that a lab would be reasonable in refusing to make an exclusion determination. Although he claimed that the sample was not mixed, his testimony was brief and ambiguous on that matter, and he seemed to disagree with the only protocol presented on whether it was advisable to interpret a mixed sample.

In contrast, Watson unambiguously testified that he was dealing with a mixed sample, and interpreting a mixed sample was not appropriate. The state district court credited this testimony.[71] Unlike Dr. Shields, Watson had access to the samples themselves and, presumably, the complete

---

[71] Order, finding 13.

data generated during testing. Genomic testing revealed a mixed sample of appellant's and Twila's DNA on those very hairs, and it may well be that it was that mixture that contaminated the second hair, rendering a mitochondrial DNA test unreliable.[72]

In conclusion, the record does not show the unavailability of DNA testing under the "no fault . . . interests of justice" provision because defense counsel's decision to forgo testing was a reasonable trial strategy. And assuming, without deciding, that post-trial evidence could in an appropriate case require us to retrospectively second-guess a trial strategy that was reasonable at the time, the evidence presented here does not require us to do so.

The judgment of the trial court is affirmed.

Delivered: September 23, 2009
Publish

---

[72] The state district court also found, based upon findings in the federal district court, that the DNA result on the second hair was not significant because the home was an area of high traffic, and even if the hair were Robert Donnell's, he had been in the home on many occasions. Order, finding 13. We do not decide whether those findings can be reconciled with the position of the district court in finding 12 and our holding in the appeal from appellant's first motion for DNA testing that the presence of a mixed sample on hairs contained in Twila's right hand was highly incriminating evidence that showed that appellant's DNA was deposited during Twila's struggle for her life.