Death Opinion




 




 


 





IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,073






LARRY RAY SWEARINGEN, Appellant



v.



THE STATE OF TEXAS







ON DIRECT APPEAL IN

CAUSE NUMBER 99-11-06435-CR FROM THE 9th DISTRICT COURT 

OF MONTGOMERY COUNTY, TEXAS





 Hervey, J., delivered the opinion for a unanimous Court.



O P I N I O N



 Larry Ray Swearingen ("Appellant"), sentenced to death for the capital murder of Melissa
Trotter, appeals an order denying his motion for post-conviction forensic DNA testing. For the
following reasons, we affirm the judgment of the trial court.

 The evidence from appellant's 2000 trial shows that, in December 1998, appellant murdered
Melissa Trotter by ligature strangulation with a piece of pantyhose during an aggravated sexual
assault or kidnapping or attempted kidnapping and left her body in a national forest where it was
found about three weeks later. See also Swearingen v. State, 101 S.W.3d 89, 92-95 (Tex. Crim. App.
2003) (more fully setting out the evidence presented at appellant's 2000 trial). In this third Article
64 proceeding that appellant has filed, the trial court made findings, supported by evidence presented
at appellant's 2000 trial and other evidence developed during post-conviction proceedings, that
overwhelmingly support appellant's guilt.

 Since his 2000 trial, appellant has filed an initial habeas corpus application and numerous
successive habeas corpus applications, two of which we found contained claims that could be
considered on their merits under Article 11.071, Section 5, Tex. Code Crim. Proc. This Court
denied habeas corpus relief on the merits of these applications (the initial habeas corpus application
and two successive habeas corpus applications) and dismissed appellant's other successive habeas
corpus applications as an abuse of the writ. In addition, appellant filed his first Chapter 64 motion
for DNA testing in October 2004, which the trial court denied in April 2005. Appellant filed his
second Chapter 64 motion for DNA testing in May 2008, which the trial court denied on January 19,
2009.

 Appellant filed this third Chapter 64 motion for DNA testing on January 6, 2009, just three
weeks before his 2009 execution date. The trial court denied that motion on January 19, 2009. 
Appellant's third Chapter 64 motion for DNA testing requested DNA testing of materials for which
appellant could have, but did not, seek DNA testing in either of his two previous Chapter 64 motions
for DNA testing. Appellant's third Chapter 64 motion for DNA testing requested an order
authorizing:

 1. retesting of the blood under the victim's fingernails, using STR or mini-STR
testing, to get a more complete STR profile that can be uploaded into CODIS and
compared to STR profiles from other pieces of evidence;

 2. the comparison of the existing STR profile from the blood under the victim's
fingernail scrapings to the State and Federal DNA databanks-CODIS;

 3. testing of any other material from the fingernail scrapings of the left and right
hands using Y-STR testing that focuses only on male DNA;

 4. testing of scrapings from the ripped jeans for contact or touch DNA using STR or
mini-STR testing;

 5. testing of the ligature for touch DNA using STR testing;

 6. testing of the victim's clothing, especially the areas where her clothes were moved,
for touch DNA using STR testing;

 7. testing of the foreign pubic hair that was recovered during the collection of the
rape kit using STR or mitochondrial DNA testing; and

 8. comparison of any profiles obtained from the testing requested in 3-6 to the profile
in 1 and 2.

(Footnote omitted and emphasis in original).

 In his order denying DNA testing, the trial judge concluded that DNA testing was available
at the time of trial and that testing of blood flakes found under the victim's fingernails would be 
improper as it had already been tested and the testing provided accurate and probative results. (1) 
Additionally, the trial court concluded that testing of the fingernail scrapings of the left and right
hands and that testing of the scrapings from the ripped jeans was improper because there had been
no showing that these evidentiary items contained biological material. (2) The court also found testing
of the ligature and the victim's clothing was improper because there had been no showing that these
evidentiary items contained biological material. Additionally, the court found appellant's motion
to test the pubic hair improper because the pubic hair could not be found and a chain of custody
could not be established. Finally, the court found that appellant's request for DNA testing was
improper because the request was made to unreasonably delay the execution of appellant's sentence. 
Appellant timely filed a direct appeal on January 23, 2009. In his appeal, he asserts the trial court
improperly denied his request for DNA testing and presents the following issues to this Court.

 1. Whether Appellant is entitled to conduct post-conviction DNA testing on the
victim's right and left hand fingernail scrapings, the ligature used to strangle the
victim, several discrete areas of the victim's clothing that were touched by the
perpetrator, and any hairs still in existence that were recovered from the scene,
where such testing (a) satisfies the requirements of Chapter 64 of the Texas Code
of Criminal Procedure, i.e., that exculpatory results would create at least a "51%
chance" that he would not have been convicted, and (b) has the capacity to
conclusively establish Appellant's actual innocence by identifying another
convicted offender as the true perpetrator through use of the CODIS DNA
database?


 2. Whether the District Court erred in failing to consider the significant non-DNA
evidence refuting the State's evidence at trial and supporting Appellant's innocence
in denying his request for DNA testing?


 Appellant contends that the exculpatory results of the testing would create at least a 51%
chance that he would not have been convicted. He further contends that the testing results have the
capacity to conclusively establish appellant's actual innocence by identifying another person as the
true perpetrator. The State argues that requests for testing should have been made at trial or in any
of appellant's previous two motions for DNA testing and the results of DNA testing already
conducted on evidentiary materials have proven to be probative and accurate. The State also argues
that appellant has failed to prove that the evidence that he wants submitted for post-conviction DNA
testing contains biological material. This court is guided by precedent and Chapter 64 of the Texas
Code of Criminal Procedure. (3) As Art. 64.01(b) indicates, different burdens exist, depending on
whether evidentiary materials have previously been tested for DNA. When reviewing an appeal
from a motion seeking DNA testing, we defer to the "trial court's determination of issues of
historical fact and application-of-law-to-fact issues that turn on credibility and demeanor, while we
review de novo other application-of-law-to-fact issues." (4) We begin our analysis with those items
that have never before been tested.

I. APPELLANT'S POST-CONVICTION REQUEST FOR DNA TESTING OF
EVIDENTIARY MATERIALS THAT PREVIOUSLY HAVE NOT BEEN TESTED 

Ripped jeans, ligature, and articles of victim's clothing

 Chapter 64 requires multiple threshold criteria to be met before a convicted person is entitled
to DNA testing. One of the primary requirements is a showing of "unavailability" which can be
established in only three ways. (5) An Applicant may show DNA testing was not available at the time
of trial. (6) If DNA testing was available, an Applicant may show that the DNA-testing technology was
not capable of providing accurate and probative results. (7) In the alternative, an Applicant may also
seek testing if the interests of justice require it and the failure to test evidence earlier was through
no fault of his own. (8) In any of the these scenarios, it must first be established that evidence sought
to be tested contains biological material. (9)

 Article 64.01(a) reads in part, "A convicted person may submit to the convicting court a
motion for forensic DNA testing of evidence containing biological material" (emphasis added). A
literal reading of the statute unequivocally mandates that all evidence to be tested must first be
proven to contain biological material. When interpreting a statute, this court is limited to its plain
meaning unless the language is ambiguous or its plain meaning leads to absurd results that the
Legislature could not possibly have intended. (10) Because Chapter 64 does not describe a method for
determining the existence of biological material, a plain reading of the statute, as appellant points
out, could lead to the deprivation of DNA testing in the rare case simply because of the inability to
ascertain whether or not biological material exists. As an appellate court, we must give effect to the
plain meaning of the statute. It is incumbent upon the Legislature, not this Court, to provide
statutory means, if appropriate, for determining whether the defendant meets the burden of showing
that evidence contains biological material. However, this court has held that a mere assertion or a
general claim that existence of biological material is probable will fail to satisfy the appellant's
burden. (11) Where an appellant has failed to provide facts in support of his motion, "we cannot say
that the convicting court erroneously determined that appellant failed to show existence of evidence
containing biological material." (12)

 Here, the trial court found that appellant failed to prove that biological material existed on
the ripped jeans, the ligature, or any of the articles of clothing. While testimony presented at trial
supports the fact that the perpetrator touched several items sought to be tested, appellant makes only
a general claim that biological material could be found from that touching. (13) In this third motion for
post-conviction DNA testing, appellant included a letter from the District Attorney's office handling
the disappearance of Jon Benet Ramsey, which hints at the success of touch DNA. (14) In his motion,
he also refers to several reports in his motion that highlight the success of Short Tandem Repeat
("STR") DNA testing. The mere fact that these DNA technologies exist and that the technology can
potentially be successful is not enough to create the right to testing. Appellant fails to show whether
STR testing would be probative or if it was even possible. Rather, appellant relies on conclusory
statements:

 The concept that individuals deposit their DNA on objects that they touch,
particularly objects like a ligature that must be grasped with such a strong force is not
a novel concept. No credible DNA analyst could question that conclusion.


 We fail to understand why this testing was not previously requested if, in fact, depositing
DNA on objects "touched" is not novel. Further, no expert testimony or scientific data was
presented to support the conclusion that DNA would necessarily be deposited through grasping with
strong force. The trial court concluded there had been no showing that evidentiary items submitted
for testing contained biological material. (15) Specifically, the trial court found that appellant failed to
show the fingernail scrapings, the ligature, the scrapings from the ripped jeans or the remaining
articles of clothing contained biological material. Almost total deference is given to a trial court's
findings concerning whether the claimed DNA evidence exists and is in a condition to be tested. (16) 
As the trial judge makes clear in its January 19th order, the record is void of any concrete evidence
that biological material existed on the evidence sought to be tested. We agree and accordingly affirm
the trial court's ruling in regards to items 4, 5, and 6.

Left and right-hand scrapings

 Swearingen also seeks "testing of any other material from the fingernail scrapings of the left
and right hands." Again, we are confronted with ascertaining whether evidentiary materials contain
biological material. The trial court expressly concluded "Movant's motion...is improper under
Chapter 64 because there has been no showing these evidentiary items do contain biological
materials." (17) We agree.

 Both right and left-hand scrapings have already been examined by Texas Department of
Public Safety ("DPS"). The only material within the right-hand scrapings was "black flaky matter"
that did not test positive for human DNA. The left-hand scrapings were examined and
criminologists found "some really small, minute trace of what appeared to be like, sand or gravel"
and "very tiny, bright red flakes." (18) Again, appellant's "proof" of biological material rests on
conclusory statements and general claims. (19) We reiterate today that in order to show evidence
containing biological material, a movant must articulate more than mere assertions. (20)

 Assuming arguendo that the fingernail scrapings do contain biological materials, movant still
fails to meet the criteria in Article 64.01(b). Evidentiary materials not previously subjected to DNA
testing can be requested only in three situations. (21) Movant argues that, because technology has
improved dramatically since his trial in 2000, he is entitled to new DNA testing. While technology
for DNA testing has certainly improved since 2000, that does not equate to a lack of technological
capability at the time of trial. The standard is not whether new technology would yield more
probative results, but whether then-existing technology was capable of yielding any probative results
at all. (22) Because appellant has not met his threshold burden of proving the evidence contains
biological material and the record shows DNA technology was capable of yielding probative results
in 2000, we uphold the trial court's decision to deny testing of the fingernail scrapings.

Pubic hair

 Appellant requests testing of a foreign pubic hair recovered during the autopsy. Indeed, pubic
hairs were recovered from a vaginal swab on January 4, 1999. (23) The specimen was sent to a crime
lab at the Federal Bureau of Investigation ("FBI"), where it was subsequently reported "no hairs were
found" on the swab used for the vaginal inspection. Since the pubic hairs were lost, the evidence
was never submitted for testing. 

 It has been said that when "potentially exculpatory evidence is permanently lost, courts face
the treacherous task of divining the import of materials whose contents are unknown and, very often,
disputed." (24) In the absence of bad faith, a failure to preserve potentially useful evidence does not
violate due process. (25) Appellant has not alleged, nor has there been any finding by the trial court
suggesting bad faith on the part of the State. Through no fault of appellant, the pubic hair was
inexplicably lost. However, while Chapter 64 allows for testing of evidence for reasons that are of
a nature that the interests of justice require it, one cannot test what cannot be found. Before a
convicting court may order forensic DNA testing, it must be shown that the evidence "still exists and
is in a condition making DNA testing possible." (26) A chain of custody must also be established. (27) 
Neither of these conditions can presently be met here. 

 While appellant does address Article 64.03 with regard to the fingernail scrapings and the
victim's clothing, no attempt is made to explain how the lost pubic hair meets the above criteria. 
The FBI report clearly states that "no hairs were found" in the sample they received from DPS. And
as the State correctly points out in its brief, even if a search were conducted and the pubic hair found,
a chain of custody could not be established. After reviewing the record, our finding is in harmony
with the trial court's conclusion: Appellant's motion to "test the foreign pubic hair that was
recovered during the collection of the rape kit is improper under Chapter 64 because no hairs were
found in that specimen, and appellant does not show that authorities would have any way of
ascertaining that any loose pubic hair found among stored evidence was from that particular forensic
specimen." (28)

II. APPELLANT'S POST-CONVICTION REQUEST FOR DNA TESTING OF
EVIDENTIARY MATERIALS PREVIOUSLY TESTED 

Blood found under the victim's fingernails

 Fingernail scrapings and a fingernail fragment were submitted to the Texas DPS for
analysis. (29) Upon a microscopic review, blood flakes were found in the fingernail scrapings collected
during the autopsy. (30) An attempt was made to extract DNA from both the blood flakes and the
fingernail fragment. (31) Each item was subjected to PCR testing. (32) It was determined that human
DNA could not be detected from the nail fragment. Criminologists however, were able to create a
full DNA profile based on DNA from blood flakes found in the fingernail scrapings. Both the
appellant and the complainant were excluded as being contributors of these flakes.

 Appellant seeks to retest blood under the victim's fingernails, using STR or mini-STR
testing. Appellant alleges these new DNA testing techniques would lead to a more complete STR
profile that can ultimately lead to the exoneration of Swearingen. Where new DNA testing
techniques will likely provide a reasonable likelihood of more accurate and probative results,
convicted persons may request additional forensic DNA testing. (33) However, on the facts of this case,
appellant has not shown a reasonable likelihood that results would be more accurate or probative. 
DPS criminalist Cassie Carradine testified that she was able to obtain a full DNA profile from the
blood found under the fingernail scrapings. Because prior DNA testing has already resulted in a
successful male DNA profile being entered into the Combined DNA Index System ("CODIS"), we
find additional testing of the left-hand fingernail clippings have no value added and therefore affirm
the trial court's ruling on this matter. 

 Appellant also claims that the trial court erred in failing to determine whether the male DNA
profile from the blood flakes has recently been compared to the CODIS DNA database to determine
if it matches a convicted offender. We decide that any attempt by appellant in this proceeding to
require the trial court to determine whether the unidentified male DNA profile has been resubmitted
to CODIS is beyond the scope of Chapter 64. Chapter 64 provides for DNA testing or retesting of
evidence containing biological material and not for database entry of already tested evidence
containing biological material that is not subject to retesting. 

 Notwithstanding the foregoing, the record also supports the trial court's finding that appellant
filed his third Chapter 64 motion for DNA testing just 21 days before his scheduled execution "to
unreasonably delay the execution of sentence." In response, he asserts that he has tried to seek DNA
testing since 2004. Appellant's established pattern of filing motions shortly before an execution date
however, leaves little doubt that stalling continues to be an effective strategy. He first filed a
subsequent writ on January 22, 2007 - two days before his scheduled execution. Appellant's last
two subsequent writs were filed on January 23, 2009 - four days before his rescheduled execution. 
Appellant could have requested DNA testing and retesting of all of the materials involved in this
case when he filed his first and second Chapter 64 motions for DNA testing. (34) 

 Moreover, in light of the overwhelming evidence of appellant's guilt, even if we were to
grant appellant's request to test all of the items proffered and those results were exculpatory,
appellant cannot show by a preponderance of the evidence, or that there is a 51% chance, that he
would not have been convicted. (35) Texas courts have consistently held that a movant does not satisfy
his burden under Article 64.03 if the record contains other substantial evidence of guilt independent
of that for which the movant seeks DNA testing. (36) 

 One judge on this Court has commented regarding the "mountain of inculpatory evidence"
against appellant. (37) A federal district court has also commented on this "mountain of inculpatory
evidence."

 To reiterate, Swearingen was the last person that Ms. Trotter was seen with alive. 
Ms. Trotter had been in Swearingen's truck, where he forcibly removed hair follicles. 
Swearingen's histological evidence does not explain why she was in his house that
day, why it was later found to be in disarray, and why he falsely claimed that there
had been a burglary there. The evidence itself does not explain why papers belonging
to Ms. Trotter were found near the house of Swearingen's parents and her cigarettes
were in Swearingen's house. The new information does not explain why Ms. Trotter
was found wearing the same clothes as when she disappeared and why she had a note
given to her by a friend on December 8 in her back pocket. The new evidence does
not show why cell phone records traced Swearingen to a location near where Ms.
Trotter was found. Histology does not explain why half of a pair of pantyhose
belonging to Swearingen's wife was found in Swearingen's house and the other half
around Ms. Trotter's neck. The new evidence does not explain why the same meal
Ms. Trotter was last seen eating was found in her stomach. Swearingen lied about
his whereabouts, tried to fabricate an alibi, made false police reports, fled from
police, asked friends to lie on his behalf, told others that the police would be after
him, and crafted an ultimately inculpatory letter to throw attention away from
himself. Swearingen told other inmates, "Fuck, yeah, I did it." Finally, Swearingen's
experts do not explain where Ms. Trotter was from December 8 until a few days
before hunters found her body. (38)

 More importantly, the trial court has made supported-by-the-record findings of fact that
again, underscore the substantial evidence of guilt. (39)


 On the evening of December 7, 1998, two of Movant's acquaintances, the Fosters, witnessed
a phone conversation in which Movant arranged for a lunch meeting with a girl at a library
the following day, and Movant then told the Fosters that the girl was Melissa Trotter, a
college student from Willis.
 Three witnesses saw Movant sitting with Melissa in the Montgomery College library
between 11:30 a.m. and 1:30 p.m. the following day, December 8, 1998.
 Melissa's Biology teacher saw Melissa leave the Montgomery College library with a male
shortly after 1:30 p.m. that day.
 Melissa's car remained in the Montgomery College parking lot following her disappearance
on December 8, 1998.
 At 2:05 p.m. on December 8, 1998, Movant called Sarah Searle and said that he was at lunch
with a friend.
 Sometime around 3:00 p.m. on December 8, 1998, Movant's landlord saw Applicant's truck
leaving from behind his home.
 At 3:03 p.m. on December 8, 1998, Movant placed a cell phone call that utilized a cell tower
near FM 1097 in Willis, Texas, which would be consistent with Movant driving from his
home to the Sam Houston National Forest.
 Movant's wife testified that she found their home in disarray on the evening of December
8, 1998, but none of the Swearingen's property was missing.
 Movant's wife observed Melissa's cigarettes and lighter in Movant's house that evening, and
those items were subsequently recovered from Movant's home during the investigation.
 Hair and fiber evidence, as well as other physical evidence, showed that Melissa had been
in Movant's car and his home on the day of her disappearance.
 Movant filed a burglary report falsely claiming that he had been out of town and his home
was broken into on the day of Melissa's disappearance.
 Between the time of Melissa's disappearance and Movant's arrest, Movant told two
acquaintances on two different occasions that he believed police would be after him.
 When the Fosters heard that Melissa Trotter was missing on December 9, 1998, they
contacted Movant, who claimed he did not remember the last name of the girl with whom
he had met the day before.
 When Mrs. Foster told Movant that she recalled him saying the last name was "Trotter," and
that a girl named Melissa Trotter was now missing, the phone went dead.
 Movant led a Sheriff's deputy on a high speed chase.
 Following Movant's arrest, law enforcement authorities observed and photographed red
marks on Movant's neck, cheek, and back.
 On December 17, 1998, two neighbors of Movant's mother and stepfather collected
numerous pieces of torn paper from along their street, which turned out to be Melissa
Trotter's class schedule and some health insurance paper work Melissa's father had given
to her.
 Melissa's body was discovered in an area of the Sam Houston National Forest with which
Movant would have been familiar from previous time spent there.
 Melissa's body showed signs of significant decomposition when it was discovered in the
woods 25 days after her disappearance.
 The ligature found around Melissa's neck matched the remainder of a pair of pantyhose
found within Movant's home.
 The Harris Country Chief Medical Examiner testified that during the digestive process, a
person's stomach will usually not empty in less than two hours, and any food within the
stomach at death will remain there.
 The contents of Melissa's stomach at the autopsy, which included what appeared to be
chicken and a french fry-like form of potato, were consistent with the tater tots she had eaten
at Montgomery College shortly before leaving with Movant and the Chicken McNuggets she
and Movant had apparently purchased at the nearby McDonald's on the day of her
disappearance.
 While in jail, Movant attempted to create an exculpatory letter written in Spanish in which
he claimed to be someone else who had knowledge of Melissa's murder.
 Within that letter, Movant detailed specifics of the offense that accurately corroborated the
physical and medical evidence in the case.



 While in jail awaiting trial, Movant told a cell mate that he had committed the capital murder
and his only objective was to escape the death penalty.



 Because of the overwhelming evidence of guilt independent of any potentially exculpatory
DNA testing and appellant's inability to show a 51% probability that he would not have been
convicted, appellant's first issue is overruled.

 In his second issue, appellant claims that the trial court "erred in failing to consider the
significant non-DNA evidence refuting the State's evidence at trial and supporting Appellant's
innocence in denying his request for DNA testing." This claim pertains to evidence that appellant
presented at a hearing in support of one of his successive habeas corpus applications-that the victim's
body was left in the national forest sometime after appellant's arrest. The convicting court made
findings contrary to appellant on this claim, and this Court adopted these findings in denying
appellant relief on this claim. We cannot conclude that the trial court would have abused its
discretion if it had not reconsidered this evidence in connection with appellant's third request for
more DNA testing. Moreover, any error in doing so was harmless in light of the overwhelming
evidence of appellant's guilt. 

 The judgment of the trial court is affirmed. 


 Hervey, J.


Delivered: February 10, 2010

Publish 



1. The Department of Public Safety (DPS) lab, in prior DNA testing of the blood flakes, was
able to obtain a full DNA male profile that did not match that of the appellant. 
2. Tex. Code Crim. Proc. art. 64.01(a).
3. See Routier v. State, 273 S.W.3d 241, 245-46 (Tex. Crim. App. 2008).
4. Rivera v. State, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002).
5. See Skinner v. State, 293 S.W.3d 196, 200 (Tex. Crim. App. 2009)
.
6. Tex. Code Crim. Proc. art. 64.01 (b)(1)(A)(I).
7. Tex. Code Crim. Proc. art. 64.01 (b)(1)(A)(ii).
8. Tex. Code Crim. Proc. art. 64.01 (b)(1)(B).
9. Tex. Code Crim. Proc. art. 64.01 (a).
10. Boykin v. State, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).
11. Routier, 273 S.W.3d at 256 ("At present, however, the appellant has provided no concrete
evidence that such an examination was actually done, or if it was, that any biological material that
may have been recovered was retained...the appellant fails to meet her threshold burden of showing
that there is even any evidence containing biological material to be tested.").
12. Dinkins v. State, 84 S.W.3d 639, 642 (Tex. Crim. App. 2002).
13. See Appellant's January 6, 2009 Motion, at 4-5. In appellant's third motion for post-conviction DNA testing, appellant asserts, "Trotter's upper garments were obviously grabbed with
considerable force, more than enough to dislodge skin cells and other biological evidence from the
person who carried her into the woods." Shortly later, appellant claims, "The force needed to strangle
someone by ligature also would have abraded testable biological materials from the hands of the
attacker." 
14. See Appellant's January 6, 2009 Motion, Exhibit H. In the letter, the District Attorney
comments on the ability to obtain DNA using the scraping method, "a process in which forensic
scientists scrape places where there are no stains or other signs of the possible presence of DNA...."
15. See Order on Third DNA Mtn., findings 29-32, conclusions of law 3-4.
16. Rivera, 89 S.W.3d at 59.
17. Order on Third DNA Mtn., finding 30, conclusion of law 3
.
18. Id., findings 17, 19, 25, 28.
19. Reply to State's Motion Opposing Petitioner's January 6th Motion for DNA testing, pg. 5
(Movant argues that the failure to detect any human DNA on the victim's right hand "should not,
by definition preclude additional testing....[I]t is unlikely that no human DNA is present on the
victim's fingernail scrapings. At a minimum we would expect to see the victim's DNA.").
20. Routier, 273 S.W.3d at 250 (rejecting defendant's speculative claim that a tube sock might
have been used to gag her and therefore could contain additional biological material in the form of
saliva and deciding that defendant failed to meet her threshold burden of showing any "evidence
containing biological material" in the form of saliva to be tested).
21. Tex. Code Crim. Proc. art. 64.01 (a)-(b).
22. Routier, 273 S.W.3d at 249, 251.
23. See Third DNA Mtn. Exhibit A, pages 35-38
.
24. Arizona v. Youngblood, 488 U.S. 51, 109 S. Ct. 333 (1988).
25. Id.
26. Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(I).
27. Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(ii) (the evidence has been subjected to a chain
of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered
in any material respect).
28. Order on Third DNA Mtn., conclusion of law 6
.
29. According to an October 8, 1999, DPS report, left-nail scrapings were submitted to the
DPS lab on January 4, 1999. An additional fingernail fragment was also submitted on October 27,
1999. 
30. In a supplemental report, DPS reported that "small red flakes were detected
microscopically on the scraping stick used on the victim's left fingernails. The red substance was
collected and frozen pending DNA analysis."
31. A supplemental DPS report dated December 10, 1999, stated
, "An attempt was made to
extract DNA from the swab of the nail scrapings, two swabs from the suspect's truck, the roots of
the six head and pubic hairs, the swab of the nail fragment, and the blood standard from Robbie Lynn
Grove."
32. Polymerase Chain Reaction ("PCR") is a method used to analyze a short sample of DNA
by amplifying selected sections allowing for reproduction of the original strand.
33. Tex. Code Crim. Proc. art. 64.01 (b)(2).
34. See Tex. Code Crim. Proc art. 64.03 (a)(2)(B) (convicting court may order DNA testing
only if it finds, among other things, that the convicted person establishes by a preponderance of the
evidence that the request for DNA testing is not made to unreasonably delay the execution of
sentence or administration of justice).
35. See Skinner v. State, 293 S.W.3d 196, 200 (Tex. Crim. App. 2009) (Another requirement
is the "different outcome" showing, which is satisfied when the "convicted person establishes by a
preponderance of the evidence that ... the person would not have been convicted if exculpatory
results had been obtained through DNA testing.") (citing Tex. Code Crim. Proc. art.
64.03(a)(2)(A)).
36. See Prible v. State, 245 S.W.3d 466 (Tex. Crim. App. 2008); Wilson v. State, 185 S.W.3d
481 (Tex. Crim. App. 2006); Hood v. State, 158 S.W.3d 480 (Tex. Crim. App. 2005); Whitaker v.
State, 160 S.W.3d 5, 9 (Tex. Crim. App. 2004); Carter v. State, 134 S.W.3d 484 (Tex. App.-Waco
2004); Brewer v. State, 143 S.W.3d 389 (Tex. App.-Beaumont 2004).
37. Ex parte Swearingen, 2009 WL 249778, at *9 (Tex. Crim. App. 2009) (Cochran, J.,
concurring).
38. Swearingen v. Thaler, Slip Op. 2009 WL 4433221, at *23 (S.D. Tex. November 18, 2009).
39. Order on Third DNA Mtn., finding 39.