

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,046

**HENRY WATKINS SKINNER, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 5216
### IN THE 31ST DISTRICT COURT
### GRAY COUNTY

**HERVEY, J., delivered the opinion of the unanimous Court.**

### O P I N I O N

Henry Watkins Skinner, Appellant, was convicted of capital murder and sentenced to death. He filed numerous Chapter 64 motions seeking post-conviction DNA testing. Most recently, the convicting court found that he has not shown that it is reasonably probable that he would not have been convicted had the results been available during his trial. TEX. CODE CRIM. PROC. arts. 64.01, 64.04. Appellant appealed that finding to this Court. *Id.* art. 46.05. While Appellant's appeal was pending, he asked us to remand the

case so that prior DNA test results obtained by the Department of Public Safety (DPS) could be reanalyzed using a new protocol for interpretations of DNA mixtures.[1] *See Skinner v. State*, 484 S.W.3d 434, 438–39 (Tex. Crim. App. 2016) (*Skinner IV*). We agreed and remanded the case. After the reanalysis was complete, the convicting court again found against Appellant. We will affirm the court's amended finding.

## FACTUAL BACKGROUND

### a. Appellant's Relationship to the Complainants

Appellant was charged with capital murder for killing Twila Busby, Randall "Randy" Busby, and Elwin Caler on December 31, 1993. Appellant and Twila were romantically involved beginning in August 1993. By December 1993, Appellant lived with Twila in her home with her two young-adult sons, Randy and Elwin. Randy was "mentally retarded" and Elwin was "a little slow." They were both tall, but neither was particularly strong. Randy was very thin, and Elwin was overweight, weighing about 255 pounds. Elwin also had diabetes and muscular dystrophy. Witnesses testified that Randy and Elwin were well-liked in the community and not known for being violent.

Beverly Clark, Twila's mother, and Howard Mitchell, Twila's longtime friend, lived near Twila and saw her and Appellant often. Twila told Clark and Mitchell that she loved Appellant, but they did not like him. Mitchell remembered Appellant being possessive of Twila and jealous

---

[1] *See* TEX. DEP'T OF PUB. SAFETY, ERROR IN THE FBI-DEVELOPED POPULATION DATABASE, *available at* https://txdpslabs.qualtraxcloud.com/ShowDocument.aspx?ID=51856 (June 30, 2015) (last visited May 29, 2019). On remand, DPS also reanalyzed its prior results using new probabilistic-genotyping software.

of any attention she received, and he said that Appellant told him that he loved Twila about a month before the murders, but that he would "waste her if she did him wrong, you know, was unfaithful." By "waste," Mitchell understood Appellant to mean that he would kill Twila.

### b. Events Immediately Preceding the Offense

Mitchell threw a New Year's Eve party the evening of the murders. At approximately 9:30 p.m., Mitchell spoke to Twila and Appellant on the phone, and they told him that they wanted to go to his party, but that they needed a ride. Mitchell told them that he would pick them up, and he arrived at Twila's house between 10:15 p.m. and 10:30 p.m. Appellant was "passed out" on the living room couch, and there was a large, partially-empty vodka bottle near him. Mitchell tried wake him up but was unable to. Mitchell thought that Twila seemed frustrated and that she was worried that Appellant would be mad if she was gone when he woke up. Mitchell and Twila eventually decided to go to the party anyway and left Appellant on the couch.

At the party, Twila was drinking vodka from a bottle. Twila's maternal uncle, Robert Donnell, was already at the party and was extremely intoxicated. He followed Twila around the party, making rude sexual advances and generally "agitating" her. Thirty to forty-five minutes after they arrived, Twila asked Mitchell to take her home. He thought that Twila seemed "fidgety and worried" and anxious to get back. Mitchell's daughter, who was also at the party, testified that Twila seemed annoyed by Donnell's behavior, and she also thought Twila might want to go home.

Mitchell drove Twila home between 11:00 p.m. and 11:15 p.m.[2] He wished her a Happy

---

[2] In his summary of the trial evidence, Appellant states that "Mitchell 'sensed that Donnell would be a danger'" and that when Mitchell agreed to take Twila home around 11:15 p.m., he noticed that she was "fidgety and worried." However, Appellant's characterization of

New Year and gave her a quick kiss on the lips, after which she went inside, and Mitchell drove away. Mitchell's daughter said that Donnell left the party before her father returned.

### c. Discovery of the Offense

Not long after Mitchell dropped off Twila, Elwin was found on a neighbor's porch wearing only his underwear and bleeding from stab wounds. The police arrived within minutes, but he was unresponsive. He died at a hospital approximately forty-five minutes later. Officers discovered a trail of blood spots leading away from Twila's enclosed front porch. The front door was a glass storm door, and there was a large blood smear on the inside part of the glass. Because the door was latched from the inside, police entered the porch through another door. When they entered, they saw a large bloody knife lying by the house's front door. When officers entered the house, they found Twila's and Randy's bodies.

Twila was lying on her back on the living room floor. Her body was almost unrecognizable because her face and head had been severely beaten with a wooden axe handle. The front of her shirt had been pushed up, or had ridden up, and was a few inches above the waist of her jeans, which were unzipped. Because her jeans were unzipped, investigators initially believed that she might have been sexually assaulted. The wooden axe handle was leaning against a couch near Twila's body. One end of the handle was matted with hair and blood. A wet rag with brownish stains and a black plastic bag containing a knife were found lying on the

---

Mitchell's testimony is misleading. Mitchell's remark about Donnell being "a danger" concerned Mitchell's general impression of Donnell upon Donnell's months-earlier release from prison. The remark did not concern Donnell's attitude or behavior around Twila at the New Year's Eve party.

ground in front of the couch.[3]

Officers found Randy lying face down on the top bunk bed in the bedroom he shared with Elwin. Randy was covered with a blood-spotted blanket, and he had been stabbed in the back three times.

### d. Appellant's Behavior Immediately After the Offense

While police were at Twila's house, Appellant was at Andrea Reed's trailer about three-and-a-half blocks away. She was Appellant's former Alcoholics Anonymous (AA) sponsor. Reed testified that she woke up just after midnight on January 1, 1994 to the sound of Appellant banging on her front door. She did not open the door and told Appellant to leave, but he still managed to enter her trailer. Appellant told Reed, "They're out to get me, they're shooting at me." He also told her that he had been shot and stabbed in the shoulder, chest, and stomach, and he insisted that Reed help him.

Reed, a recovering drug addict and alcoholic, thought that Appellant seemed intoxicated from drugs or alcohol. She also saw a lot of blood on his shirt, his right pants leg, his watch, and his left hand. Despite Appellant's apparent intoxication, he removed his shirt and laid it on a chair without help and asked Reed to suture a badly bleeding cut on his right palm. And even though Appellant told Reed that he had been stabbed multiple times and had been shot, the only injury she saw was the cut to his right palm.

---

[3] Investigators found a hand print on the outside of the bag, but they were unable to identify the donor of the print. As Appellant acknowledges in his reply brief, the hand print was later compared to Donnell's fingerprints, and the prints were not consistent. *Skinner v. Cockrell*, No. 2:99-CV-0045 (N.D. Tex.) (ECF 72: Order Granting Leave to Conduct Discovery).

Reed agreed to suture the cut, and Appellant heated and bent sewing needles for her to use. While Reed was cleaning Appellant's right hand, he washed the blood off of his left hand and watch with a rag. He later used the bathroom without assistance.

Appellant and Reed talked for a few hours. At one point, Reed tried to leave the room to call the police, but Appellant threatened to kill her if she did. When Reed told Appellant that she needed to call Twila to find out what was going on at her house, Appellant told Reed not to call anyone. They continued talking, and as they talked, Appellant described past events that Reed knew never happened. He also told Reed several inconsistent accounts about how his right hand was cut.[4] Eventually, Appellant offered to tell Reed "what really happened" so long as she swore to God not to tell anyone. After Reed promised, Appellant said that he thought he had kicked Twila to death.

Police officers found Appellant at Reed's residence at about 3:00 a.m. When Appellant heard the cars arriving, he told Reed, "It's the law," and he went into her bedroom.

### e. Appellant's Post-Arrest Behavior

The police found Appellant hiding in Reed's bedroom closet. He was wearing

---

[4] Appellant told Reed that (1) two knife-wielding "Mexicans" had suddenly appeared at the front and back doors of Twila's house and that they cut his palm when he threw up his hand; (2) he had gotten into a fight with Twila's ex-husband after finding them in bed together; (3) a person named Ricky Palmer had broken into the house; and (4) cocaine dealers were looking for Twila, who owed them money.

bloodstained socks and blue jeans, and he appeared to be intoxicated. But Appellant was coherent and seemed to be oriented to his location. When officers informed him that they were arresting him on prior outstanding warrants, he replied, "Is that all I'm being arrested for?"

Appellant was taken to a hospital to receive treatment for the cut on his hand. While there, Appellant voluntarily gave a blood sample. He was subsequently transported to the Pampa Police Department, where an officer photographed him and collected his bloody clothing as evidence. Officers escorted Appellant to a holding cell at one point to use a toilet, and one of the officers noticed that Appellant was urinating on the blood stains on his right leg and was trying to rub the stains away with his hand. When the officer ordered him to stop, Appellant cursed at the officer but complied.

### f. Appellant's Post-Arrest Statement

On January 4, 1994, Appellant voluntarily gave a statement to police. Appellant told them that he had a long history of heavy drinking and had previously attended AA, but that he and Twila would often drink together until they blacked out and that the officers would "be amazed" at how well he could function when intoxicated, even if he did not always remember what he did. Appellant also said that he and Twila "ha[d] had some knock-down drag-outs" during their relationship and that the wooden axe handle was a "stick" that they used around the house for various purposes.

According to Appellant, he had been drinking vodka and taking Xanax all day the

day of the murders, and he remembered falling asleep on Twila's living room couch sometime after 7:00 p.m., but he claimed not to remember much after that. One thing he said that he did remember, however, was that Twila said something about going to Mitchell's house and him telling her not to go. Appellant also said that Twila and Mitchell were "real big buddies" and that he "didn't want [Twila] over there" because every time she went to Mitchell's place, she "g[ot] drunk and screw[ed] up."

Appellant claimed that he woke up on the couch sometime before midnight. According to him, he remembered that someone was standing over him. He also noticed that the vodka bottle was gone, and he assumed that Twila drank the rest of the vodka or that she took the bottle with her to Mitchell's house. Appellant said that Twila was intoxicated when she returned and that she cut his right hand with a knife. He thought he then left Twila's house by running out of the back door, and although he initially said that he did not think he was capable of murdering them, he later stated that he could "see [himself] arguing with Twila," and he "might even see maybe [he] might have killed her."

### g. Autopsy Evidence

The medical examiner who conducted the complainants' autopsies testified that Twila had been manually strangled into unconsciousness and beaten at least fourteen times about the face and head with a straight, roughly cylindrical object. The blunt force trauma inflicted by the blows caused "tremendous deforming and extensive injury" to Twila's head and brain, resulting in her death.

The medical examiner noted Twila's clothing when officers discovered her body (i.e., that the front of her shirt was a few inches above the waist of her jeans, which were unzipped), and she had collected samples from Twila's body for a rape kit, but she did not know whether the kit had been processed. Based on her education, training, and experience, the medical examiner concluded that the attack on Twila was not sexual in nature; rather, she thought that Twila's injuries, which were centered on her face, "were indicative of someone attacking her who [was] angry with her personally and [who knew] her on a personal basis."

The medical examiner testified that Randy and Elwin both died of stab wounds. Elwin suffered two stab wounds: a non-fatal wound to his abdomen and a fatal wound under his left arm. The fatal stab penetrated Elwin's left lung and caused massive internal bleeding, which would have rapidly rendered him unresponsive. Randy was stabbed three times. The first time he was stabbed, the instrument hit Randy's shoulder blade and stopped. The second time, the stabbing instrument hit and glanced off of Randy's shoulder blade, penetrating muscle. The third and fatal stab, however, penetrated Randy's ribs and pierced his lung and heart.

The evidence further indicated that Twila, Randy, and Elwin sustained their wounds within the same general time frame and that either of the knives found (i.e., the knife on the porch or the knife in the bag in the living room) at the scene could have inflicted Randy's and Elwin's wounds, while the axe handle could have caused Twila's

fatal injuries. The medical examiner testified that the palm of Randy's assailant's could have been cut if the assailant's hand slipped across the knife blade when the blade hit and glanced off of Randy's shoulder blade. When asked how much force it would take to manually strangle a person into unconsciousness or death, the medical examiner said that it would require "some strength," but she could not quantify the exact amount of force necessary.

### h. Toxicology, DNA, and Fingerprint Evidence

Toxicological testing of a blood sample given by Appellant at 5:48 a.m. on January 1, 1994, showed that he had 0.11 milligrams of codeine per liter of blood in his system and a blood alcohol concentration of 0.11 at the time the sample was taken. But even though Appellant told the police he had been drinking alcohol and taking Xanax the night of the offense, no Xanax was found in his blood, and the State presented testimony that Xanax does not metabolize into codeine. The evidence also showed that the level of codeine in Appellant's system was within a therapeutic range and consistent with Appellant having taken one 60-milligram codeine tablet a few hours earlier. It also showed that heavy drinkers, like Appellant, generally metabolize alcohol more quickly and experience less intoxicating effects than non-heavy drinkers.

The State collected various items from the scene, including samples of blood found on Appellant's shirt and blue jeans, which were submitted for DNA testing.[5] The results revealed

---

[5] DNA testing was conducted on blood stains on the blanket from Randy's bed, a hair on Randy's body, and a hair found on Randy's blanket. The results showed that the DNA profiles on the blanket, and the hair on Randy, were consistent with Randy's DNA profile. The DNA profile

DNA profiles consistent with Twila's, Elwin's, and Appellant's. A forensic analyst testified that only one in 5.5 billion people would have the same DNA profiles as the ones extracted from these blood samples.

Fingerprint evidence showed that bloody hand prints found on the door frame and door-stop moulding in Randy and Elwin's bedroom, where Randy's body was found, were consistent with Appellant's prints, as were bloody fingerprints found on the knobs of the door leading from the kitchen to the utility room. The hand print on the knob of the door between the utility room and the backyard was also identified as Appellant's.

The State theorized that Twila returned home from Mitchell's New Year's Eve party to find Appellant awake, jealous, and enraged. It argued that Appellant choked Twila until she was unconscious, then beat her to death with the axe handle that investigators found near her body. Appellant then, according to the State, stabbed Randy and Elwin because they were witnesses, and while stabbing Randy, Appellant cut his palm. The State asserted that Elwin, bleeding and dying, fled to the neighbor's house and that Appellant followed him as far as the front porch, but then he dropped the bloody knife outside the front door, reentered the house, and fled through the back door.

### i. The Defense's Case-in-Chief

Defense counsel presented a three-pronged defense: He argued that the investigation was incomplete and sloppy, that Donnell was an alternate suspect who could have committed the murders, and that Appellant was incapable of committing the murders because he was too intoxicated and because of his hand injury.

---

extracted from the blanket was consistent with Elwin's DNA profile.

*1. Incomplete Investigation*

Defense counsel highlighted the State's failure to test some items for DNA and emphasized other shortcomings in the investigation. For example, defense counsel criticized the State's decision not to compare hairs found in or on Twila's hands to known hair samples from Elwin, Randy, and Appellant. According to counsel, the hair was from the real assailant, and the absence of Appellant's hair, or the presence of an unknown person's hair, would have tended to exonerate Appellant. Counsel likewise criticized the State's decision not to look for blood or other materials on nail clippings taken from Twila's hands.

In its guilt-phase case-in-chief, the State called Gary Stallings, a DPS Crime Laboratory Services criminalist, who assisted the local authorities by forensically examining certain evidence collected at the crime scene, to rebut defense's counsel's theories. On cross-examination, Stallings acknowledged that it was theoretically possible for a victim to grab the hair of her assailant while being attacked, and for that hair to end up on her hands. But, in his professional experience, he had never seen that occur. He further explained that, even if the hairs were Appellant's, or were from a third party, that evidence would not be particularly probative in this case because Appellant lived with the victims and Twila's body was found on the carpeted living room floor. According to Stallings, "carpet is really bad about retaining hairs that have been dropped" because "they tend to stick in the [carpet's] pile" and remain there even after vacuuming. Appellant's hair, as well as the hair of anyone who ever visited the house, Stallings testified, could have simply fallen to the carpet or been deposited "just through the air in the house in the day-to-day activities" before the offense. Stalling said that the hair then could have been transferred to Twila's hands from the carpet. Based on the foregoing, he made a decision

not to conduct further testing because it was more likely that the hairs were deposited on Twila's hands through innocent transfer from the carpet.

As for the nail clippings, Stallings explained that testing for blood or skin cells on the clippings was unlikely to yield probative information because there was no evidence suggesting that Twila had attacked and scratched her assailant. The evidence suggested that Twila was in fact bleeding profusely and in a defensive posture, trying to protect herself while Appellant repeatedly hit her on the head. Stallings said that he did not test Twila's fingernail clippings for blood because his "common sense" told him that any blood beneath Twila's fingernails would be her own.

### 2. Donnell as an Alternate Suspect

Defense counsel portrayed Robert Donnell as an alternate suspect who could have committed the murders. Counsel elicited evidence that Donnell carried a knife and was known for being quick-tempered. In particular, according to defense counsel, one time Donnell grabbed a pregnant woman by the neck and threatened her, and a few months after the murder, he pulled down the bathing suit bottoms of his nephew's sleeping female friend. Defense counsel also presented evidence that Donnell verbally abused the woman after she woke up and kicked him in the face for pulling down her bathing suit bottoms and argued that Mitchell thought that Donnell was a "danger" to Twila.

### 3. Extreme Intoxication & Injured Hand Prevented Appellant from Murdering the Victims

The defense called toxicologist Dr. William Lowry to testify about Appellant's claims that he was too intoxicated to murder the victims. Lowry estimated that the alcohol and codeine

levels in Appellant's system near the time of the offense would have been significantly higher than when the sample of his blood was taken at 5:38 a.m. According to him, if Appellant's alcohol and codeine levels were as high as he estimated near the time of the murders, Appellant probably would have been in a "stuporous state," meaning that he was asleep or comatose until about 3:30 a.m., with impaired consciousness, general apathy, and an inability to stand or walk. Based on that, Lowry concluded that Appellant could not have traveled under his own power to different rooms in the house to kill the victims.[6] Lowry's extrapolation evidence was based on an assumption that Appellant took three times the standard therapeutic-level dose of codeine at around 8:00 p.m. on the evening of the offense. He acknowledged, however, that the amount of codeine in Appellant's system was also consistent with him having taken a single therapeutic-level dose of codeine after midnight. He also acknowledged that Twila had a blood alcohol concentration of 0.19 at the time of her death, which would have affected her coordination and rendered her unable to defend herself when she was killed.

The defense presented testimony from Joe Tarply, an occupational therapist, who specialized in hand therapy. Tarpley testified that Appellant was right-handed and suffered a laceration to that hand about six months before the offense. As of Tarpley's February 2, 1995, testing, Appellant had reduced right-hand strength. But Tarpley acknowledged that his testing occurred after Appellant injured his right hand the night of the offense, so Tarpley was unable to

---

[6] Despite that testimony, Lowry was surprised by how well Appellant was able to function the night of the offense. For example, Appellant was able to conclude after he woke up that Twila had taken the vodka bottle and left him alone without anything to drink, and he was able to find Reed's house, which was nearly four blocks away. Also, while he was there, he asked her to suture his hand and prepared the implements, e.g., heating and bending the needle, he threatened her not to call anyone, and he was able to, without assistance, use the bathroom.

say how strong Appellant's right hand was before he suffered the new injury. Tarpley was also unable to say whether Appellant's physical condition at the time of the offense would have prevented him from holding the wooden axe handle found at the scene or from inflicting Twila's injuries using it.

## POST-CONVICTION PROCEDURAL HISTORY

A jury convicted Appellant of capital murder for killing Twila, Randy, and Elwin in the same criminal transaction, and the trial judge sentenced him to death. TEX. PENAL CODE § 19.03(a)(7)(A); TEX. CODE CRIM. PROC. art. 37.071, §§ 2(b), 2(e), 2(g). We affirmed Appellant's conviction and sentence on direct appeal and denied post-conviction relief.[7] Appellant also filed a federal habeas corpus petition. He argued that his counsel was ineffective in various respects, but all of his claims were denied by the district court or on appeal to the Fifth Circuit. *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009). In 2010, Appellant filed a federal civil rights suit seeking access to biological material retained by the district attorney's office for testing. *Skinner v. Switzer*, 562 U.S. 521, 534 (2011); *see* 42 U.S.C. § 1983. The district court found against Appellant, as did the Fifth Circuit, but the United States Supreme

---

[7] Appellant's state post-conviction procedural history is extensive. *Skinner v. State*, 956 S.W.2d 532 (Tex. Crim. App. 1997) (direct appeal). We dismissed Appellant's first post-conviction writ application challenging his capital murder conviction as untimely filed. *Ex parte Skinner*, No. WR-20,203-03 (Tex. Crim. App. Dec. 2, 1998) (not designated for publication). Appellant thereafter filed a habeas petition in federal district court. While that petition was pending, Article 11.071 was amended, and Appellant filed a motion in this Court to establish a new filing date for his initial state habeas application. We granted the motion, *Ex parte Skinner*, No. WR-20,203-03 (Tex. Crim. App. Aug. 31, 2000) (not designated for publication), and Appellant timely filed his application. We subsequently dismissed the application because Appellant's federal habeas petition was still pending. *Ex parte Skinner*, No. WR-20,203-04 (Tex. Crim. App. Oct. 10, 2001) (not designated for publication). Later, we denied Appellant's Article 11.071 application because it failed to satisfy the subsequent-writ bar of Section 5. *Ex parte Skinner*, No. WR-20,203-07 (Tex. Crim. App. Mar. 17, 2010) (not designated for publication).

Court reversed and remanded, holding that Appellant could seek DNA testing through a civil rights action. *Skinner v. Switzer*, 562 U.S. 521, 534 (2011); *see* 42 U.S.C. § 1983.

## 2000 PRE-CHAPTER 64 DNA & MtDNA TESTING

In July 2000, before Chapter 64's enactment, the State voluntarily sent additional items of evidence associated with the offense to GeneScreen, a private forensics laboratory, for DNA testing. *See Skinner v. State*, 293 S.W.3d 196, 198 (Tex. Crim. App. 2009) (*Skinner II*). These items included: hair and fiber samples; fingernail clippings; a cigarette butt; blood on a portion of a blue notebook; hair from the wooden axe handle found near Twila's body; two items from Randy and Elwin's shared bedroom (a hair and a cassette tape with bloody prints on it); and blood-stained gauze. *Id.* at 198–99. GeneScreen subjected these items to either traditional genomic DNA testing or to the then-newer mitochondrial DNA (MtDNA) testing, or both.[8] *Id.* at 198. It issued reports in 2000 and 2001. *Id.*

> GeneScreen's genomic DNA testing revealed that:
>
> Twila was included as a contributor to blood on the cover of [the] blue notebook, a hair found on her back, a hair found on her left hand, and a hair from [the] axe handle. Appellant was included as a contributor to DNA found on [the] cigarette butt. Twila and [A]ppellant were both included as contributors to a mixed profile from hair in Twila's right hand. [The] [b]loodstained gauze reflected the profile of an unknown male individual, and a cassette tape with blood on it reflected a profile that was a mixture of two unknown individuals. No conclusion could be drawn about certain other items.

*Id.* at 198–99. The MtDNA testing revealed Twila's MtDNA profile in one of two hairs found in

---

[8] "Mitochondrial DNA . . . is separate from nuclear DNA and different from it in that mitochondrial DNA comes solely from the mother and is therefore a clone of her mitochondrial DNA rather than a blending of the nuclear DNA from both parents." *Wilson v. State*, 185 S.W.3d 481, 490 n.13 (Tex. Crim. App. 2006) (Johnson, J., concurring).

her right hand, as well as in some other hairs collected from the scene.[9] *Id.* at 199. Appellant was excluded as a contributor to the hairs. *Id.* The results were inconclusive as to the other hair found in Twila's right hand and a hair found in the living room. *Id.*

### 2012–2013 CHAPTER 64 DNA TESTING

While his federal habeas proceedings were pending, Appellant filed three motions in the convicting court seeking post-conviction forensic DNA testing pursuant to Chapter 64. Appellant sought DNA testing of items that had not been tested before trial or by GeneScreen in 2000 through 2001. However, Appellant's efforts were unsuccessful. *Skinner v. State*, No. AP-76,675 (Tex. Crim. App. June 20, 2012) (*Skinner III*) (not designated for publication); *Skinner II*, 293 S.W.3d 196; *Skinner v. State*, 122 S.W.3d 808, 810 (Tex. Crim. App. 2003) *(Skinner I)*. Nevertheless, the testing was eventually performed through a 2012 agreement with the State in the form of an "Agreed Joint Order of the Parties for DNA Testing" (Agreed Joint Order). *See Skinner IV*, 484 S.W.3d at 436–37. The convicting court approved the Agreed Joint Order in June 2012, and the testing took place from 2012 through 2013.

The Agreed Joint Order identified 40 items or categories of evidence to be submitted to DPS for DNA testing. These items included: blood samples from Appellant and the complainants; certain elimination blood samples; Twila's fingernail clippings; Twila's vaginal swabs and smears; hair recovered from Twila's hands; blood stains on clothing and bedding; blood stains on the walls, carpeting, furniture, and doors at the crime scene; and the bloody knife recovered from Twila's enclosed front porch.

DPS forensic scientist Brent Hester was in charge of the testing. As part of the initial

---

[9] The MtDNA profile could have come from Twila or any of her maternal relatives.

screening process, Hester tested 191 items for the presence of blood using a presumptive-blood test, only 94 of which tested positive. Hester also examined swabs and slides collected during Twila's autopsy for semen, but he did not detect any. John Lan Bundy, a trace-analysis scientist for DPS, assisted Hester in this initial evaluation.[10] Bundy screened evidence, conducted a visual and stereoscopic examination of external hair characteristics, and catalogued those results. After the screening process, the parties agreed that Hester would conduct DNA testing on 115 of the 191 samples.

In the 2012 round of DNA testing, Hester used Identifiler Plus Amplification (Identifiler Plus), which used a Polymerase Chain Reaction (PCR) to amplify Short Tandem Repeat (STR) DNA sequences in the samples.[11] Because two unknown profiles were identified during the Identifiler Plus STR-PCR testing, the parties agreed to additional DNA testing of two items: the bloody knife found on the front porch and carpeting cut from Elwin and Randy's bedroom floor. The additional DNA testing took place in 2013. Hester evaluated samples from the knife and

---

[10] Bundy had retired from DPS by the time of the first Article 64.04 in February 2014, which we discuss later.

[11] Polymerase Chain Reaction is a DNA amplification method that "makes millions of copies of a specific sequence of DNA in a matter of only a few hours" using "an enzymatic process." "Without the ability to make copies of DNA samples, many forensic samples would be impossible to analyze" due to being small or degraded, like those often found at crime scenes. JOHN M. BUTLER, FORENSIC DNA TYPING: BIOLOGY, TECHNOLOGY, AND GENETICS OF STR MARKERS 63 (2d ed. 2005).
Short Tandem Repeat refers to sequences of DNA that are repeated multiple times within DNA. "STRs have become popular DNA repeat markers because they are easily amplified by the polymerase chain reaction without the problems of differential amplification" and because STRs are effective in identifying human components of DNA material as "the marker can be highly variable among individuals . . . ." *Id.* at 85.

carpet using a MiniFiler PCR Amplification kit (mini-STR) and a Y-STR analysis.[12]

Pursuant to the parties' court-approved agreement, Hester used a MiniFiler to test "a piece of carpeting cut from around an existing stain that had previously been subject to [the 2012] STR testing." With the testing of this additional item, Hester assessed a total of 116 samples during 2012 and 2013.

### a. The Testing

Using Identifiler STR-PCR and Mini-STR analyses, Hester identified nineteen stains containing partial or complete DNA profiles which were consistent with Appellant. Eight of the profiles came from stains collected in Randy and Elwin's bedroom (from stains on a cassette tape, a cassette tape holder, a tennis shoe, a comforter, a dresser, and from a bloody handprint on the door frame by the dresser). Hester identified eight more profiles consistent with Appellant in stains or swabs taken from various places on the bloody knife found outside the front door of Twila's house on the floor of the enclosed porch.[13] Hester also identified DNA profiles consistent with Randy and Elwin in some of the same stains and swabs from the knife. The remaining three of the nineteen profiles, which were consistent with Appellant, came from door-knob scrapings and a stain on the back door.

Through STR analysis, Hester identified fourteen partial or complete DNA profiles which were consistent with Twila. He identified these fourteen profiles in or on: right- and left-hand

---

[12] A Y-STR analysis focuses on amplifying STR sequences on the Y chromosome, which assist forensic scientists in identifying male genetic material in a sample. JOHN M. BUTLER, FUNDAMENTAL OF FORENSIC DNA TYPING 364–66 (1st ed. 2010).

[13] The record shows that the swabs were taken during the original investigation of the crime scene. In consultation with the parties, Hester also tested stains on the knife.

fingernail clippings and a vaginal swab taken from Twila at autopsy; eight hairs recovered from Twila's hands; a blood spot on a dishtowel; the door-stop moulding in Randy and Elwin's bedroom; and carpet from the entrance to the kitchen.

Using Identifiler and MiniFiler analyses, Hester identified ten stains which contained partial or complete DNA profiles consistent with Randy. Three of these profiles came from stains on a blanket on the top bunk bed where Randy's body was found. Five of these profiles came from the knife found on the front porch, and these same five stains also contained DNA profiles which were consistent with Appellant's and Elwin's. The two remaining DNA profiles, which were consistent with Randy's profile, were found in two different stains on carpet from Randy and Elwin's bedroom. The first of these stains contained a mixture of profiles consistent with Randy's and Elwin's profiles. The second carpet stain contained a mixture of three profiles, two of which were consistent with Randy and Elwin. The third profile was unidentified.

Hester also tested several other items that yielded no result or no interpretable result. The items that yielded no result included: ten hairs; the knife found inside a plastic bag in the living room; the "outer door" door knobs; a stain on the "upper outer front storm door"; a pair of Wrangler jeans from Randy and Elwin's bedroom; and thirty-two stains on Elwin's underwear. The items that yielded no interpretable result included: a "Fingerhut" card; three additional stains on Elwin's underwear; Randy's underwear; certain stains on sheets taken from Randy and Elwin's bedroom; and a stain above a dresser in that bedroom.

In addition to DPS, Bode Technology Group, Inc. (a private forensic laboratory) conducted MtDNA testing of certain items. These items included four hairs recovered from Twila's hands. Bode identified a partial MtDNA profile which was consistent with Appellant's

MtDNA profile on one hair from Twila's right hand. Bode also identified a partial MtDNA profile which was consistent with the MtDNA profile shared by Twila, Randy, and Elwin in three hairs from Twila's "ring finger, right hand, and left hand."

### b. February 2014 Article 64.04 Hearing and Original Findings of Fact and Conclusions of Law

In February 2014, following completion of the 2012 to 2013 Chapter 64 DNA testing, the convicting court held a two-day live evidentiary hearing. Appellant presented testimony from Julie Heinig, an assistant laboratory director and technical leader at DNA Diagnostics Center. The State presented testimony from Hester and Bundy. Following the hearing, the convicting court entered Article 64.04 findings in which it found Hester's and Bundy's testimony more credible than that of Heinig, and it further found that, "had the DNA testing results been available in March 1995 during [Appellant's] trial for capital murder, it is reasonably probable that [Appellant] would have been convicted."

### ISSUES ON ORIGINAL SUBMISSION AND SUBSEQUENT REMAND TO REANALYZE THE TEST RESULTS

In 2015, Appellant appealed the convicting court's adverse Article 64.04 determination to this Court, raising two issues for our consideration. TEX. CODE CRIM. PROC. art. 64.05 (an appeal under Chapter 64 is direct to the Court of Criminal Appeals if the defendant was sentenced to death). Appellant first asserted that the trial court did not apply the correct legal standard, erroneously placing the burden on him, based on the wording in its legal conclusion that "it is reasonably probable that [Appellant] would have been convicted." Under Article 64.04, the required finding is "whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted." *Id.* art. 64.04. Next,

Appellant challenged the convicting court's conclusion about the potential effect of the Chapter 64 DNA testing results on his capital murder conviction. Appellant asserted that it was reasonably probable that he would not have been convicted if the results of the 2012 and 2013 testing had been available at the time of his trial.

We did not reach a decision on the merits, however, because Appellant received notice that the DNA test results previously reported by DPS might be incorrect due to errors identified in the statistical databases DPS relied on in analyzing DNA mixtures. *Skinner IV*, 484 S.W.3d at 438–39. Instead, we remanded the case with instructions for the convicting court to ensure that the recalculation process proceeded in a timely fashion; to engage in necessary further fact-finding and analysis; and to return the record to this Court for reinstatement of the appeal. *Id.*

## PROCEEDINGS ON REMAND

### a. Reanalysis Results

On remand, Hester reanalyzed his previous DNA testing results using a new probabilistic genotyping software called "STRmix." This process took place during 2016 and 2017.

The convicting court summarized Hester's report in its Amended Findings of Fact (Amended Findings). Hester again reported that Appellant could not be excluded as a contributor to nineteen blood stains associated with the offense. He also reported that it was more likely that the profiles developed from the stains belonged to Appellant than to a random person or persons:[14]

- 2 stains on a cassette tape from Randy and Elwin's bedroom;

- 2 sets of scrapings from door knobs;

---

[14] The associated probabilities Hester reported were generally in the astronomical range.

- 1 stain on the back door;

- 2 stains from a tennis shoe from Randy and Elwin's bedroom;

- 1 stain on a comforter in Randy and Elwin's bedroom;

- 1 stain on the dresser in Randy and Elwin's bedroom;

- 1 stain near a bloody hand print on the door frame by the dresser;

- 1 stain on a cassette tape holder in Randy and Elwin's bedroom;

- 1 swab on the handle of the bloody knife from Twila's front porch, in a mixture where Larry Porton, the court reporter from trial, could not be excluded;[15]

- 1 swab on the base of the blade of the bloody knife from Twila's front porch, in a mixture where Randy and Elwin could not be excluded; and

- 6 swabs collected by DPS in 1994 from the bloody knife on Twila's front porch, in a mixture where Randy or Elwin (or both) could not be excluded.

Hester also reported that, consistent with his prior DNA testing results, he could not exclude Twila as a contributor to the following fourteen of the samples, and that it was far more likely that Twila's DNA profile was present in these samples than the DNA of a random person or persons:

- 1 vaginal swab (consistent with Twila);[16]

- 2 sets of fingernail clippings from Twila's left and right hands (consistent with Twila);

- 8 hairs recovered from Twila's hands;

---

[15] Due to potential contamination of evidence, known DNA samples from people such as the court reporter (Larry Porton), Bundy, and Hester, who may have handled the evidence, were used to eliminate them as possible donors.

[16] No semen was detected on any of the 6 vaginal swabs or smears taken from Twila.

- 1 stain from a blood spot on a dishtowel;

- 1 stain from door stop moulding in Randy and Elwin's bedroom; and

- 1 stain from carpet at the entrance to the kitchen.

After the STRmix testing, Hester reported that Randy could not be excluded as a contributor to the following thirteen stains (an increase from the ten stains reported in pre-remand DNA testing). He additionally reported that it was more likely that Randy's DNA profile was represented in these stains than the DNA profile of a random person or persons:

- 3 stains on a blanket on the top bunk bed;

- 2 stains from a sheet on the top bunk bed;

- 3 stains on carpet from Randy and Elwin's bedroom, in a mixture where Elwin could not be excluded;

- 4 swabs collected by DPS in 1994 from the bloody knife on Twila's front porch, in a mixture where Appellant and Elwin could not be excluded; and

- 1 swab on the base of the blade of the bloody knife from Twila's front porch, in a mixture where Appellant, and Elwin could not be excluded.

Hester further reported that Elwin could not be excluded from the following nineteen stains, and it was more likely that Elwin's DNA profile was present in them than the profile of a random person or persons:

- 1 swab on the base of the blade of a bloody knife from Twila's front porch, in a mixture where Appellant and Randy could not be excluded;

- 1 stain from lower outer portion of the front storm door;

- 1 stain on the inner front storm door;

- 5 stains from Elwin's underwear;

- 1 stain from the comforter in Randy and Elwin's bedroom;

- 1 stain from the interior side of the door in Randy and Elwin's bedroom;

- 3 stains from carpet from Randy and Elwin's bedroom, in a mixture where Randy could not be excluded; and

- 6 swabs collected by DPS in 1994 from the bloody knife on Twila's front porch, in a mixture where Appellant and Randy could not be excluded.

### b. January 2018 Article 64.04 Hearing

In January 2018, the convicting court held a live evidentiary hearing concerning the effect, if any, of the reanalyzed results on its original Article 64.04 determination. Appellant presented testimony from Nathaniel Adams, a systems engineer at Forensic Bioinformatic Services, and Jennifer Hornyak, a DNA analyst at Cybergenetics. The State again called Hester. The State also presented testimony from Dr. Bruce Budowle, a professor at the University of North Texas Health Science Center and Director of the Center for Human Identification.

### c. The Convicting Court's Amended Article 64.04 Findings

Following the second evidentiary hearing, the convicting court entered Amended Findings pursuant to Article 64.04. The convicting court found that the testimony provided by the State's expert witnesses was more credible than the testimony provided by Appellant's expert witnesses and that it was not reasonably probable that Appellant would have been acquitted had the DNA testing results been available during Appellant's capital murder trial. TEX. CODE CRIM. PROC. art. 64.04.

### ISSUES ON RESUBMISSION

After the convicting court entered its amended Article 64.04 finding, and the supplemental record was forwarded to this Court, Appellant filed a post-remand supplemental

briefing. He argued that the 2016–2017 re-analysis had no material impact on the original Chapter 64 test results, but that Appellant was nevertheless entitled to a favorable finding based on the 2012 and 2013 Chapter 64 DNA testing results. Although Appellant acknowledges that the convicting court's Amended Findings now precisely track the statutory language of Article 64.04, he also continues to insist that the convicting court's accompanying analysis shows that it does not understand Article 64.04's required inquiry.

In its post-remand supplemental briefing, the State agrees that the reanalysis does not meaningfully impact the original Chapter 64 testing results, and it argues that neither the original nor the reanalyzed Chapter 64 results make it reasonably probable that he would not have been convicted had those results been available at his trial.

## STANDARD OF REVIEW

When reviewing an Article 64.04 finding, we apply a bifurcated standard of review. *Dunning v. State*, 572 S.W.3d 685, 692 (Tex. Crim. App. 2019). Under this bifurcated standard, we give almost total deference to the convicting court's determination of historical facts and application-of-law-to-fact questions turning on witness credibility and demeanor. *Id.* When reviewing other application-of-law-to-fact questions, we defer to the convicting court's subsidiary findings of historical fact, but we review its application of the law to those facts *de novo*. *Id*.

## ANALYSIS

### a. Appellant Has Not Met His Article 64.04 Burden

Contrary to Appellant's assertions, we find no evidence that the convicting court

misapplied the Article 64.04 standard.[17] Further, we agree with the convicting court's conclusion that Appellant has not satisfied his Article 64.04 burden because he has not shown that it is reasonably probable that he would not have been convicted had the test results been available during his capital murder trial. TEX. CODE CRIM. PROC. art. 64.04.

**b. Innocent Explanations for Finding Appellant's DNA/Alleged Testing Flaws**

At the first evidentiary hearing, as previously noted, the State called Hester and Bundy to testify, and Appellant called Heinig. Through Heinig, Appellant advanced a number of explanations as to why test results that appeared to be unfavorable were not actually unfavorable. Those results showed that DNA consistent with his profile on nineteen items intimately connected to the offense. These items included the knife that was likely used to kill both Randy and Elwin; objects from the bedroom where Randy's body was found; and a hair in Twila's hand.[18] Heinig theorized that the DNA could have been there due to innocent touch-transfer, that the samples might have been contaminated, that there might be have been hidden underlying DNA profiles, that the DNA might have been degraded or weak, and that the DNA might have

---

[17] While the convicting court did not track the language of Article 64.04 in its original findings of fact and conclusions of law, we are convinced that it applied the correct standard of review based on our examination of the record.

[18] Heinig posited that the presence of Appellant's DNA on these items intimately associated with the killings could have resulted from innocent contact or the phenomenon of transfer-DNA. Heinig also emphasized that GeneScreen and DPS had obtained different results when they performed DNA testing on the cassette tape found in Randy and Elwin's bedroom. However, as the convicting court noted in its Amended Findings, there was no evidence that Genescreen and DPS tested the same areas of the cassette tape.

Heinig further noted that Appellant's DNA was found in scrapings from door knobs and blood from the back door. Heinig asserted that, if Appellant had killed the victims, then one would have also expected to find the victims' DNA in these locations. However, evidence presented at the two hearings significantly undermined Heinig's assertion.

been mishandled or improperly stored in the years following Appellant's trial. The convicting court found that Appellant's theories, presented through Heinig's testimony, did not help Appellant satisfy his Article 64.04 burden because she merely tried to explain away inculpatory results. We defer to the convicting court's finding.

### c. Extraneous Alleles on the Dishtowel and MtDNA Testing of Hairs Visually Dissimilar to the Victims

The convicting court found that Appellant identified only two areas of evidence which were potentially relevant to the Article 64.04 inquiry: (1) the existence of "extraneous alleles" appearing on both sides of the dishtowel that investigators found in the plastic bag on Twila's living room floor; and (2) the MtDNA testing results obtained about hairs that were "visually dissimilar" to Twila's, Elwin's, and Randy's hair.

### *1. The Dishtowel*

To analyze the dishtowel, Hester used a "minitape" procedure to conduct STR-PCR testing.[19] Through the minitape procedure, "[ten] samples were obtained on a given side and then analyzed collectively, while a separate blood spot (stain 3) was analyzed using conventional STR-PCR methods." In addition, "a separate blood spot (stain 3) was analyzed using conventional STR-PCR methods, all of which were eventually reanalyzed via STRmix."

Hester reported, according to the convicting court, that "Side 1 [wa]s a mixture of three individuals and it [wa]s 147 billion times more likely that Larry Porton, the court reporter at trial, contributed his profile to the mixture rather than a random person." Side 2 was "a mixture of

---

[19] Hester testified that minitapes are "literally a clear transparency [used] in a copy machine, in a box and double-sided Scotch tape both purchased at Staples." According to Hester, he lays two rows of double-sided tape on the transparency and cuts the rows out. Then, wearing gloves, he touches the minitapes to the surfaces where biological material might be found.

three individuals and it [wa]s 13,400 times more likely that [Porton], and 242 quintillion times more likely that DPS forensic analyst John Lan Bundy, contributed their profiles to the mixture rather than a random person or persons." However, "[t]he blood spot (stain 3) originated from a single individual and it [wa]s 6.2 quintillion times more likely that Twila contributed to this profile than a random person."

The convicting court found that the dishtowel test results did not assist Appellant. Appellant's expert Heinig testified at the first hearing that there were several loci in DNA profiles which contained "extraneous alleles." Specifically, she testified that a "17" allele appeared at the D3 loci in profiles on both sides of the dishtowel; that the person who left the extraneous "17 allele" at the D3 locus on side 1 of the towel might also have left the "17 allele" at the same D3 locus on side 2; and that the killer might have deposited the DNA by having wiped his hands on the dishtowel after the murders.

But the convicting court did not credit Heinig's potentially innocent explanations. It credited Hester's testimony. Hester testified that minitape is an especially sensitive procedure which is "very good at doing [its] job," but that it sometimes pulls off too much DNA and leaves a "very, very nasty mixture" of profiles. He also testified that minitapes are sensitive enough to collect biological material from an item, like the dishtowel, even after the dishtowel was washed and that, even though Appellant was excluded as a contributor to the partial DNA profiles found in the mixture by Hester on both sides of the dishtowel during his initial testing, his exclusion did not rule out Appellant as a possible contributor of extraneous alleles at a given locus because he could not account for every allele.

The convicting court found that the results were not helpful because no evidence was

presented at either hearing to show that any of the extraneous alleles were deposited at the time of the crime or who the extraneous alleles might have belonged to. The reanalysis results only reinforced Hester's explanation, according to the convicting court, because the result was inconclusive regarding whether Appellant contributed his DNA to side one of the dishtowel.[20]

## 2. MtDNA Testing

The MtDNA results linked three hairs to the MtDNA profiles of Twila, Elwin, and Randy. Appellant argued through his expert, Heinig, that the results were exculpatory because the hairs pointed to a maternal relative (i.e., Twila's maternal uncle, Robert Donnell) as the source since maternal relatives share the same MtDNA profile, and Bundy excluded the victims as the donors of the hairs based on a visual examination.

Bundy described the three hairs at issue, as well as a fourth hair, as being "visually dissimilar" to known head-hair standards for the complainants. These known head-hair standards ranged from light brown (for Elwin), brown to dark brown (for Randy), and light reddish brown to reddish brown (for Twila). He said that one hair from Twila's right hand was visually dissimilar in color ("blond to reddish blond"), that a second hair from Twila's right hand was visually dissimilar in color ("blond to reddish blond") and structure ("flatter cross-x, much curlier and much lighter in color"), and that a hair from Twila's left hand was visually dissimilar "in color (lighter)." Bundy noted that the hair in Twila's left hand might have been a body hair. Finally, a hair from Twila's "ring finger" was noted as being visually dissimilar in color ("blond

---

[20] Appellant also argues that the absence of his DNA from the dishtowel assists him in meeting his Article 64.04 burden because it provided another avenue by which he could create doubt, but the convicting court disagreed. It found that Appellant could not be ruled out as a contributor to the extraneous alleles, so the results did not assist Appellant.

to reddish blond") and structure ("wavy to curly"). Although Bundy concluded that the hairs were visually dissimilar from the complainants' hair, contrary to Heinig's testimony, the convicting court found Bundy still included the victims as possible contributors of the hairs.

Bundy first examined the hairs with the "naked eye" and a stereoscope, rather than a microscope, to examine the hairs' external features or characteristics. He did so as a "screening tool" to assist in determining which hairs had root bulbs, meaning that they were viable for STR-PCR testing. Bundy emphasized that he did not conduct a microscopic examination and that his use of the phrase "visually dissimilar" in his notes and laboratory report simply meant that he did not "microscopically analyze[]" these samples. He also testified that his comparison did not exclude anyone as a possible source of the hairs because that conclusion would exceed the scope of macroscopic analysis and that it is "actually quite common" for persons with overall dark-appearing hair (like Twila, Elwin, Randy, and Appellant)[21] to also have blond or reddish-blond hairs because there is "so much variation with a human head" in terms of observable, external hair characteristics such as length, color, thickness, and texture.

The convicting court credited Bundy's testimony that he did not actually exclude any of the victims as donors of the hairs despite the observed difference in hair color, and it further concluded that no evidence was presented to establish that the hairs did not come from the victims. The convicting court also determined that Bode's MtDNA testing results on all four of these "visually dissimilar" hairs did not assist Appellant in meeting his burden under Article

---

[21] During the first evidentiary hearing, the State displayed various photographs of Twila, her children, and various maternal relatives (Twila's mother, Beverly Clark; Twila's uncle, Robert Donnell; and Twila's sister, LaDonna Alderson). The State also played an excerpt of a videotaped interview with Appellant. The convicting court found that all these photos and the video footage showed persons with darker colored hair, rather than blond to reddish blond hair.

64.04. According to the convicting court, Bode reported finding a partial MtDNA profile consistent with Appellant from one hair found in Twila's right hand ("the -E03 hair"),[22] which the convicting court found tended to show that Appellant's hair was in the hand of one of the capital murder victims.[23]As to the remaining three hairs recovered from Twila's hands, the convicting court acknowledged that Bode identified on each hair a partial MtDNA profile that was consistent with Twila's, Randy's, and Elwin's mitochondrial DNA profiles. However, the convicting court determined that these results had little probative value standing alone, because, even as Heinig testified, a MtDNA match cannot exclude any maternal relatives or distinguish among them. Consequently, the three hairs at issue could have come from Twila herself or from any of her maternal-line relatives, including Twila's three biological children (Elwin, Randy, and daughter Lisa Busby),[24] her mother (Beverly Clark), her three siblings,[25] her two maternal uncles, and her maternal grandmother. While Robert Donnell was one of Twila's maternal uncles, the MtDNA profiles on three hairs did not, standing alone, convey any meaningful information about his potential involvement (if any) in the offense. Further, the convicting court found that there

---

[22] In addition, Bundy described the -E03 hair as being "blond to reddish blond," whereas Appellant's hair overall appears to have been dark-colored at the time of the offense. The fact that this blond to reddish blond hair was nonetheless probably Appellant's hair supports Bundy's evidentiary testimony that dark haired people can indeed have individual light-colored hairs.

[23] As we previously noted, at trial, the jury heard testimony that the presence or absence of Appellant's hair in or on Twila's hands would not have been particularly probative, given the particular circumstances of this case.

[24] The record shows that, in addition to Randy and Elwin, Twila had a third child, Lisa Busby. Lisa, like Randy, was "mentally retarded." At the time of the offense, Lisa lived nearby with Twila's mother, Beverly Clark. However, Lisa had previously lived with Twila.

[25] The trial record showed that at least one of Twila's siblings, Douglas Ward, lived in the same geographic area as Twila.

was no other information to suggest that these three hairs were deposited during the commission

of the capital offense or that they came from someone other than the victims.[26]

### d. Storm Door Blood Stains, Enclosed Porch Knife Blood Stains, Vaginal Swabs and Smears, Nail Clippings, and Bedroom Blood Stains

As to the other DNA testing results, the convicting court found that they did not help

Appellant satisfy his Article 64.04 burden.

Test results from blood stains on the front storm door revealed partial DNA profiles from

which Elwin could not be excluded. The results were not helpful because they were consistent

with the State's theory at trial that Elwin was stabbed inside the home, and while bleeding, he

made his way out of the front door to the enclosed front porch, and then fled to a neighbor's

house, leaving a trail of blood behind him.

Also, Appellant's DNA profile appeared in all eight samples taken from the bloody knife

found on the front porch (six samples collected by DPS in 1994 and two collected by DPS in

2012), but no unidentified foreign profile was found on this item, which was most likely the

knife used to murder Randy and Elwin given that their profiles were also found on it. The

convicting court noted that, regardless of Appellant's theories of innocent-contact, touch-transfer

of DNA, the DNA testing results consistently showed that Appellant's DNA was mixed in blood

found on the knife.

The results of DNA testing on vaginal swabs and smears also gave no support for

---

[26] For example, Twila's body was found lying on the carpeted living room floor. Contemporaneously-taken photographs from trial showed that the carpet was dirty with trash and debris, and there was testimony that the hair found in Twila's hands was not especially relevant because it could have originated from anyone who had ever visited the house and because carpet is particularly effective at retaining hair.

Appellant's defensive theory at trial that Donnell (or anyone else) sexually assaulted Twila on the night of her murder because the swab revealed a DNA profile consistent with Twila's, and no semen was found on the vaginal smears.

The DNA test results obtained from Twila's fingernail clippings also do not assist Appellant because no foreign DNA was present.

Also, STRmix testing of eight hairs found in Twila's hands showed no unidentified DNA profile. Rather, the DNA profiles obtained from those hairs, coupled with the other evidence presented at trial and in these Chapter 64 proceedings, strongly indicated that they came from Twila rather than from an unknown assailant or Twila's uncle, Donnell.

Testing of samples in Randy and Elwin's bedroom included blood stains on clothing and bedding, blood stains on walls and carpeting, and blood spatter on furniture and items found on the floor. The testing showed that Appellant could not be excluded as a possible donor of DNA in eight more locations than were established at trial. The testing also showed that it was far more likely that the DNA profile belonged to Appellant than a random person or persons. As to the blood stain on the door-stop moulding, the results showed not only that Twila could not be excluded as a contributor, but also that it was more likely that the profile belonged to Twila than to a random person or persons. As the convicting court stated in its Amended Findings, these results were not helpful to Appellant because,

> [a]t a minimum, the results mean [Appellant's] DNA profile was found in blood in the bedroom where Randy was stabbed to death. The results would also be contrary to [Appellant's] defense at trial that he was too incapacitated by his intoxication to be moving through the house. And the fact that Twila's DNA was found in blood on the door stop moulding supports the State's theory that [Appellant] killed Twila and then went to kill the boys to leave no witnesses.

The convicting court acknowledged that testing on a stain from a dresser in Randy and Elwin's bedroom revealed a mixture of DNA profiles from which Hester and an unknown contributor could not be excluded. The listed D8 loci alleles were 10, 11, but Hester's alleles at the D8 loci are 8, 13, meaning that those alleles were extraneous. However, the convicting court determined that these results did not assist Appellant because,

> no evidence was presented at the hearings to show that any extraneous allele was deposited at the time of the crime. Also, as Hester testified, extraneous alleles at D8 are consistent with [Appellant] even though [Appellant] was excluded from the overall DNA profile based on the initial round of testing.

The convicting court continued:

> Without more, the existence of extraneous alleles does not make it more likely that, had these results been available at trial, [Appellant] would not have been convicted. This is especially true given that reanalysis did not exclude [Appellant], but rather determined that it was inconclusive as to whether he was a possible contributor to the sample.

The convicting court also acknowledged that two unidentified profiles[27] appeared in one spot of blood on carpet just inside the entranceway to Randy and Elwin's bedroom ("stain 2") and in an immediately adjacent portion of that carpet ("stain 3"). These profiles were developed through STR-PCR and Mini-STR DNA testing via STRmix, as well as Y-STR DNA testing. When these profiles were run through state and federal DNA databases, there were no matches.[28] But the convicting court determined that these test results did not assist Appellant because it credited Hester's testimony that sensitive tests such as MiniFiler and Y-STR DNA analysis "lend themselves to complex[,] possibly uninterpretable profiles." It also noted that the carpeted

---

[27] The 2012–2013 DNA testing revealed three unidentified DNA profiles, but additional testing strongly suggested that two of these three profiles came from the same contributor.

[28] Two of the three initial profiles matched each other.

entranceway to Randy and Elwin's bedroom was a high-traffic area, likely to accumulate all kinds of debris unrelated to the offense. It determined that unidentified profiles on carpet were of no help to Appellant because, as Hester testified, a foreign profile could have come "from anyone who visited the room the carpet was in or even the person who laid the carpet originally." In short, the convicting court concluded in its Amended Findings that the presence of third-party DNA at the crime scene does not cast "even a reasonable doubt on [Appellant's] presence at the scene of the murders or [Appellant's] involvement in the capital offense."

We have made similar observations in the past concerning this case. In our opinion affirming the convicting court's denial of Appellant's first Chapter 64 motion, we stated that:[29]

> In our fact recitation, we pointed to the "bloody palm prints" matching [A]ppellant and to the fact that [A]ppellant's clothing "was covered in the blood of two of the victims." In the analysis section of our opinion, we explained that the mixture of [A]ppellant's and Twila's DNA in blood found on the hairs in Twila's right hand "demonstrates the intermingling of the victim's and [A]ppellant's DNA, probably during the time when she was struggling for her life." From this evidence, we concluded that "there is nothing about the other items found at the crime scene that, if linked to a third person, would cast doubt on the [A]ppellant's presence at the scene of [Twila's] death or the [A]ppellant's involvement in the offense. Given this evidence and the other evidence detailed above, the presence of a third party's DNA at the crime scene would not constitute affirmative evidence of innocence."

*Skinner II*, 293 S.W.3d at 199 (footnotes omitted) (discussing our opinion in *Skinner I*).

In sum, the circumstantial evidence of Appellant's guilt presented at his capital murder trial was strong and many of the test results are affirmatively inculpatory. The convicting court was therefore correct to conclude that Appellant failed to meet his burden under Article 64.04.

**CONCLUSION**

---

[29] Our reference to "innocence" was referring to Article 64.03(a)(2)(A), which we have interpreted to require exculpatory results that would prove the convicted person's innocence.

After reviewing the record, we agree with the convicting court that Appellant failed to satisfy his Article 64.04 burden. Consequently, we affirm the convicting court's amended Article 64.04 ruling denying relief.

Delivered: October 5, 2022

Publish